IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

SABRINA WILSON,                     )
                                    )
        Plaintiff,                  )
                                    )
vs.                                 )
                                    )       Case No. 3:22-cv-1651-DWD
COOPERSURGICAL, INC., FEMCARE,      )
LTD., a U.K. Subsidiary of Utah Medical )
Products, Inc., and UTAH MEDICAL    )
PRODUCTS, INC.,                     )
                                    )
        Defendants.                 )

<u>MEMORANDUM & ORDER</u>

**DUGAN, District Judge:**

Before the Court are Defendants' Motions to Dismiss (Docs. 21, 22, 32) Plaintiff's

Complaint (Doc. 1) under Federal Rule of Civil Procedure 12(b). Plaintiff responded to

each Motion (Docs. 23, 24, 34). For the reasons explained below, each Motion is **DENIED**.

## I. Background

This case involves a female birth control device known as Filshie Clips, which are

"titanium clip[s] with silicone rubber lining[s]" that are implanted on a woman's

fallopian tubes. (Doc. 1, pg. 4). Filshie Clips "cause bilateral occlusion (blockage) of the

fallopian tubes…elicit[ing] tissue growth[] [and]…causing a closure of the [fallopian]

tubes." (Doc. 1, pg. 4). Plaintiff claims, over 25% of the time, Filshie Clips detach and

migrate from the fallopian tubes, wreaking havoc on the body. (Doc. 1, pgs. 4, 10-11).

Plaintiff underwent a tubal ligation procedure, resulting in the implantation of

Filshie Clips, in 2015. (Doc. 1, pgs. 4, 13). Thereafter, Plaintiff began experiencing pain

and discomfort in her lower abdominal region. (Doc. 1, pg. 13). Plaintiff's pain, allegedly caused by a Filshie Clip detaching and migrating from her fallopian tube, became more severe. (Doc. 1, pg. 13). Despite Defendants' knowledge of the risks of using Filshie Clips, Plaintiff alleges she was never informed of the frequency of detachments and migrations or the severity and permanency of the resulting injuries. (Doc. 1, pgs. 10, 13).

In August 2020, Plaintiff's doctor allegedly confirmed from radiological imaging that a Filshie Clip was missing. (Doc. 1, pg. 14). The Filshie Clip detached and migrated from her fallopian tube but remained in her body. (Doc. 1, pg. 14). The Complaint alleges Plaintiff "live[s] under the specter of having the foreign bodies migrating through her pelvic area and the fear of having to undergo surgery," as surgery is often necessary to remove a detached and migrated Filshie Clip from a woman's body. (Doc. 1, pg. 14).

Based on diversity jurisdiction, Plaintiff filed a 10-count, 93-page Complaint (Doc. 1) against Defendants, CooperSurgical, Inc., Utah Medical Productions, Inc. ("UMP"), and Femcare, Ltd., which is a subsidiary of Defendant UMP in the United Kingdom. (Doc. 1, pg. 1).[1] Defendants were sued jointly and severally as "companies and/or successors in interest to the companies that designed, developed, manufactured, tested, labeled, packaged, imported, distributed, marketed and/or sold" Filshie Clips. (Doc. 1, pg. 1). Defendant Femcare, the manufacturer of Filshie Clips, obtained conditional premarket approval ("PMA") from the Food and Drug Administration ("FDA") in 1996. (Doc. 1, pgs.

---

[1]Plaintiff is a citizen of Illinois. (Doc. 1, pg. 2). Defendant CooperSurgical, Inc., is a citizen of both Delaware, where it is incorporated, and Connecticut, where it maintains its principal place of business. (Doc. 1, pg. 2). Defendant Femcare is a citizen of Romsey, Hampshire, England, where it maintains its principal place of business. (Doc. 1, pg. 2). Defendant UMP is a citizen of Utah, where it maintains its principal place of business. (Doc. 1, pg. 2). Plaintiff seeks over $75,000 in damages.

5, 9). The Filshie Clip is a Class III medical device, meaning it "is purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health, or…presents a potential unreasonable risk of illness or injury." *See* 21 U.S.C. § 360c(1)(C); (Doc. 1, pg. 5).

The FDA evaluated the safety and effectiveness of Filshie Clips before granting PMA and authorization for commercial distribution. (Doc. 1, pg. 5). It was allegedly reported to the FDA that Filshie Clips migrated or expulsed .13% of the time. (Doc. 1, pg. 11). Further, the PMA allegedly imposed conditions on Defendant Femcare's sale of the product, including labeling requirements and restrictions on advertisements. (Doc. 1, pg. 5). Until 2019, Defendant CooperSurgical imported, distributed, marketed, and sold Filshie Clips in the United States. (Doc. 1, pg. 9). Thereafter, Defendant UMP imported, sold, distributed, and marketed Filshie Clips in the United States. (Doc. 1, pg. 9).

This case is based on Defendants' failure to comply with the FDA mandates in the PMA and violations of state and federal law. (Doc. 1, pgs. 5-7). Under 21 C.F.R. §§ 803, 814, and 820 *et seq.*, Plaintiff alleges: (1) strict product liability against Defendant Femcare for design defects (Count 1); (2) strict product liability against Defendant Femcare for a failure to warn (Count 2); (3) product liability against Defendant Femcare for negligence (Count 3); (4) gross negligence against Defendant Femcare (Count 4); (5) punitive damages against Defendant Femcare (Count 5); (6) strict product liability against Defendants CooperSurgical and UMP for design defects (Count 6); (7) strict product liability against Defendants CooperSurgical and UMP for a failure to warn (Count 7); (8) product liability against Defendants CooperSurgical and UMP for negligence (Count

8); (9) gross negligence against Defendants CooperSurgical and UMP (Count 9); and (10) punitive damages against Defendants CooperSurgical and UMP (Count 10).

## II. Analysis

Defendants' separate Motions to Dismiss under Rule 12(b) present overlapping issues. Each Defendant argues Plaintiff failed to state a claim because her claims are preempted by federal law, are not cognizable under Illinois law, and are barred by the applicable statute of limitations. Defendant UMP also argues Plaintiff failed to state a claim because it cannot be held liable as the parent company of Defendant Femcare. Finally, Defendants UMP and Femcare argue the Court lacks personal jurisdiction and is an improper venue. The Court addresses each argument in the separate sections below.

### A. Failure to State a Claim Under Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) challenges a complaint for the failure to state a claim for which relief may be granted. *See Firestone Fin. Corp.*, 796 F.3d 822, 825 (7th Cir. 2015) (quoting *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014)). To survive such a motion, which tests the sufficiency of the complaint but not the merits of the case, a plaintiff must allege enough facts to state a facially plausible claim for relief. *See Kloss v. Acuant, Inc.*, 462 F. Supp. 3d 873, 876 (7th Cir. 2020) (quoting *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 878 (7th Cir. 2012)); *Fosnight v. Jones*, 41 F.4th 916, 921-22 (7th Cir. 2022) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility means a plaintiff pled enough facts to draw reasonable inferences as to liability. *See Fosnight*, 41 F.4th at 922 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A complaint need not allege "detailed factual allegations," but it must

4

state enough facts to lift the claim above the speculative level. *See Kloss*, 462 F. Supp. 3d at 876 (citing *Twombly*, 550 U.S. at 555). "Threadbare recitals" of the elements, supported by mere conclusions, do not suffice. *See Trivedi v. Wells Fargo Bank, N.A.*, 609 F. Supp. 3d 628, 631 (N.D. Ill. 2022) (quoting *Iqbal*, 556 U.S. at 678). When ruling, the Court accepts all well-pled facts as true and draws all inferences for Plaintiff. *See id.* (quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008)); *accord Kloss*, 462 F. Supp. 3d at 874-75.

Especially notable in this case, there are no special pleading requirements for claims of product liability, generally, or for claims related to Class III medical devices, such as the Filshie Clip, specifically. *See Bausch v. Stryker Corp.*, 630 F.3d 546, 558 (7th Cir. 2010). The ordinary federal pleading standards, discussed above, apply. *See id.* However, in cases involving the defective manufacture of a medical device under federal law, "courts must keep in mind that much of the product-specific information about manufacturing needed to investigate such a claim fully is kept confidential by federal law." *See id.* Therefore, formal discovery is necessary before a plaintiff can fairly be expected to provide detailed statements on the specific bases of the alleged claims. *See id.*

### 1. Preemption

Through the Supremacy Clause of the United States Constitution, Congress may expressly or impliedly preempt any state law. *See McMullen v. Medtronic, Inc.*, 421 F.3d 482, 486-87 (7th Cir. 2005) (quoting U.S. Const. art. VI; *Chambers v. Osteonics Corp.*, 109 F.3d 1243, 1246 (7th Cir. 1997); *Boomer v. AT&T Corp.*, 309 F.3d 404, 417 (7th Cir. 2002); *Hoagland v. Town of Clear Lake, Ind.*, 415 F.3d 693 (7th Cir. 2005)). The Medical Devices Amendments ("MDA") to the Federal Food, Drug, and Cosmetic Act ("FDCA") contain

an express preemption provision for Class III medical devices. *See* 21 U.S.C. § 360k(a); *see also Gravitt v. Mentor Worldwide, LLC*, No. 17-cv-5428, --- F. Supp. 3d ----, 2022 WL 17668486, *2 (Dec. 14, 2022) ("[F]ederal law limits the state law claims that a plaintiff may pursue for injuries allegedly caused by Class III medical devices."). It states:

(a) General Rule

Except as provided in subsection (b), no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—

(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device.

*See* 21 U.S.C. § 360k(a); *see also McMullen*, 421 F.3d at 487 (noting § 360k(a) preemption requires (1) a requirement relating to a device intended for human use that a state establishes or continues in effect, (2) a federal requirement under the FDCA that applies to the specific device and is relevant to the conduct subject to the state requirement, and (3) a state requirement that is different from, or in addition to, the federal requirement); *accord Laverty v. Smith & Nephew, Inc.*, 197 F. Supp. 3d 1026, 1030 (N.D. Ill. 2016).

Federal requirements, specific to individual products, are imposed through the PMA process that Filshie Clips underwent in 1996, and lawsuits filed under state law against medical device manufacturers who acquire PMA are preempted when liability is premised on violations of state law and § 360k(a)(1) is satisfied. *See McMullen*, 421 F.3d at

487-88 (citing *Mitchell v. Collagen Corp.*, 126 F.3d 902, 911 (7th Cir. 1997)); *Bausch*, 630 F.3d at 550 (discussing *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 330 (2008)); *accord Link v. Zimmer Holdings, Inc.*, 604 F. Supp. 2d 1174, 1177 (N.D. Ill. 2008) ("The PMA process as applied to Class III medical devices by the FDA constitutes a federal 'requirement' specific to an individual device as defined in the MDA."); *McCutcheon v. Zimmer Holdings, Inc.*, 586 F. Supp. 2d 917, 921 (N.D. Ill. 2008).[2] However, consistent with § 360k(a), a plaintiff may maintain such a lawsuit if the state and federal requirements are parallel. *See Gravitt*, 2022 WL 17668486, *2 (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 495 (1996)). For a state requirement to be parallel to a federal requirement, as opposed to "different from, or in addition to," a federal requirement under § 360k(a)(1), "the plaintiff must show that the requirements are '*genuinely* equivalent.' " *See McMullen*, 421 F.3d at 489 (quoting *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 454 (2005) (Emphasis in original)); *accord Laverty*, 197 F. Supp. 3d at 1031. If a manufacturer can be liable under state law but not federal law, then the state and federal requirements are not "genuinely equivalent." *See McMullen*, 421 F.3d at 489 (quoting *Bates*, 544 U.S. at 454). Put another way, if a federal requirement permits a course of conduct that is obligatory under state law, then the state requirement is preempted as "different from, or in addition to," the federal requirement. *See id*.

The Court emphasizes that Section 360k(a) provides immunity to manufacturers of Class III medical devices, such as the Filshie Clip, only to the extent that they comply

---

[2]The PMA process operates as a federal safety review that is specific to individual devices. *See Link*, 604 F. Supp. 2d at 1177. In that process, the FDA grants PMA "only to individual devices that it determines provide a reasonable assurance of safety and effectiveness." *See id*. (citing *Riegel*, 552 U.S. at 323). The FDA weighs considerations related to the device, reaches a conclusion, then implements the conclusion through a specific mandate on manufacturers and producers. *See id*. at 1177, 1179 (quoting *Mitchell*, 126 F.3d at 911).

with and do not violate federal law. *See Bausch*, 630 F.3d at 550, 553; *accord Gravitt v. Mentor Worldwide, LLC*, 289 F. Supp. 3d 877, 885 (N.D. Ill. 2018); *Garross v. Medtronic, Inc.*, 77 F. Supp. 3d 809, 814 (E.D. Wisc. 2015). Therefore, nothing in § 360k(a) denies a state the right to provide a traditional damages remedy for violations of common law duties, including as to medical devices granted PMA, when those duties parallel federal requirements. *See Bausch*, 630 F.3d at 550, 553 (quoting *Lohr*, 518 U.S. at 495); *accord Gravitt*, 289 F. Supp. 3d at 885; *Laverty*, 197 F. Supp. 3d at 1032; *Garross*, 77 F. Supp. 3d at 814. Such remedies do not impose requirements "different from, or in addition to," federal requirements; instead, the remedies further incentivize a manufacturer's compliance with federal requirements. *See Garross*, 77 F. Supp. 3d at 814 (citing *Lohr*, 518 U.S. at 513).

Next, as to implied preemption, claims based on well-recognized duties owed in product liability actions under state law, as opposed to claims of "fraud on a federal agency," are assumed to be within the police powers of the States and are not superseded by federal law unless that was the clear and manifest intent of Congress. *See Bausch*, 630 F.3d at 557-58; *accord Gravitt*, 2022 WL 17668486, *2 ("[S]tate law claims are impliedly preempted to the extent that they are 'fraud-on-the-FDA' claims rather than traditional state law torts."); *Laverty*, 197 F. Supp. 3d at 1034; *Gravitt*, 289 F. Supp. 3d at 888. For example, a plaintiff's claims are impliedly preempted if they seek to use state law to police fraud against a federal agency based on statements a defendant was required to make to the agency under federal law. *See Gravitt*, 289 F. Supp. 3d at 888 (quoting *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 347 (2001)). Again, though, claims based on

8

well-recognized duties owed in product liability actions under state law are not impliedly preempted. *See Bausch*, 630 F.3d at 557-58; *Gravitt*, 289 F. Supp. 3d at 888.

In light of these principles, the Seventh Circuit has discussed a gap through which plaintiffs may avoid preemption. *See Bausch*, 630 F.3d at 557-58 (quoting *In re Medtronic, Inc., Sprint Fidelis Leads Products Liability Litigation*, 623 F.3d 1204 (8th Cir. 2010)). Plaintiff must be suing Defendants for conduct that *violates* the FDCA or her claims will be expressly preempted under § 360k(a), but she cannot be suing Defendants *merely because* the conduct violates the FDCA or her claims will be impliedly preempted. *See id*. (quoting *Medtronic Leads*, 623 F.3d at 1204); *accord Garross*, 77 F. Supp. 3d at 814. Plaintiff must be able to show harm stemming from a violation of the FDCA at the same time as a breach of a well-recognized and parallel duty owed under state law. *See Bausch*, 630 F.3d at 557-58 (discussing *Medtronic Leads*, 623 F.3d at 1204); *see also Garross*, 77 F. Supp. 3d at 814 ("[A] state law claim which alleges a violation of the FDCA but which alleges that violation in the context of an independent, 'well-recognized duty owed to [plaintiff] under state law' can survive both express and implied preemption.").[3]

---

[3] Notably, in Illinois, a violation of a statute, designed to protect human life, is *prima facie* evidence of negligence. *See Bausch*, 630 F.3d at 553. Also, Illinois recognizes negligence and strict liability claims arising from a manufacturer's failure to warn, *i.e.*, to disclose known defects. *See Laverty*, 197 F. Supp. 3d at 1032 (citing *Woodill v. Parke Davis & Co.*, 79 Ill. 2d 26, 29 (1980); *Hernandez v. Schering Corp.*, 2011 IL App (1st) 093306, ¶ 38). The associated duty is not limited to issuing warnings directly to end users "but rather 'depends on whether [the defendant] and [the plaintiff] stood in such a relationship to each other that the law imposed upon [the defendant] an obligation of reasonable conduct for the benefit of [the plaintiff]." *See id*. at 1035 (quoting *Solis v. BASF Corp.*, 2012 IL App (1st) 110875, ¶ 64). Further, "in Illinois, 'in a products liability action, all persons in the distributive chain are liable for injuries resulting from a defective product, including suppliers, distributors, wholesalers[,] and retailers.' " *See Smith v. Phoenix Seating Sys., LLC*, 894 F. Supp. 2d 1088, 1093 (S.D. Ill. 2012) (quoting *Hammond v. North Am. Asbestos Corp.*, 97 Ill. 2d 195 (1983)). The MDA codified standards for reporting, but it did not "eviscerate the longstanding state-imposed duty to warn simply by redefining the way medical device manufacturers satisfy that obligation." *See id*.

In this case, Defendants argue the FDA granted PMA to the Filshie Clip in 1996, and neither the original nor the supplemental PMA approvals were suspended or revoked. (Docs. 21, pg. 4; 22, pg. 10; 32, pg. 8). Therefore, Defendants argue the Filshie Clip, at all times, was deemed safe and effective. (Docs. 21, pg. 7; 22, pg. 13; 32, pg. 12). Defendants also argue Plaintiff's claims would require courts and juries to contradict or second guess the FDA in order to find Filshie Clips were "accompanied by inadequate warnings and/or…[were] defectively designed." (Docs. 21, pg. 7; 22, pg. 13; 32, pg. 12). Such findings would allegedly require different or additional warnings or designs than those approved and required by the FDA. (Docs. 21, pg. 7; 22, pgs. 13-14; 32, pg. 12).

Further, even if Plaintiff can prove violations of the FDA regulations, Defendants argue her claims do not provide a basis for non-preempted state claims. (Docs. 21, pg. 7; 22, pg. 14; 32, pg. 13). Defendants state breaches of the FDA regulations—*e.g.*, by failing to report product complaints, literature, and unpublished studies to the FDA or to provide related warnings and labeling that could have led to a different course of action by the FDA—are breaches of duties owed to the FDA, such that Plaintiff's claims are impliedly preempted. (Docs. 21, pgs. 8-9; 22, pgs. 15-16; 32, pgs. 11, 13-15).

In response, Plaintiff argues Defendants claim, relating to Illinois judges and juries, is "incredibly vague" and "based on a fundamental misunderstanding" of her claims and preemption. (Docs. 23, pg. 6; 24, pg. 4; Doc. 34, pg. 3). Plaintiff argues each Count is premised on specific factual allegations related to Defendants' failure to comply with various Current Good Manufacturing Practices "to the extent that they are parallel to and not different from or in additional [*sic*] to the requirements of federal law." (Doc.

23, pg. 7; 24, pg. 5; Doc. 34, pg. 5). Further, Plaintiff submits her allegations are based on Defendants' post-PMA actions, *i.e.*, on Defendants' violations of the FDA regulations as a manufacturer or distributor of Filshie Clips after PMA. (Doc. 23, pgs. 7-8; Doc. 24, pg. 5; Doc. 34, pg. 5). Plaintiff argues such claims, "alleging harm caused by conduct that violates a federally imposed requirement," are precisely the type the Seventh Circuit has found can survive express preemption. (Doc. 23, pg. 8; 24, pg. 5; Doc. 34, pg. 5). Finally, Plaintiff indicates courts must be cautious when considering whether to dismiss product liability claims, as information related to the nature of the defects in the product may not be available to the Plaintiff before discovery. (Doc. 23, pg. 8; 24, pg. 6; Doc. 34, pg. 5).

As to implied preemption, Plaintiff states her claims are not based entirely on a "fraud-on-the-FDA" theory and do not seek to privately enforce duties owed to the FDA. (Doc. 23, pgs. 9-10; 24, pgs. 6-7; Doc. 34, pgs. 7-8). As such, Plaintiff indicates she may use evidence of Defendants' FDA violations to prove breaches of well-recognized state law duties. (Doc. 23, pgs. 9-10; 24, pg. 7; Doc. 34, pg. 8). She argues, "the claim[s] do[] not seek to remedy the breach of a duty to the FDA, but look[] to federal law only to give content to the Defendant[s'] traditional state common-law dut[ies]," so there is a presumption against implied preemption. (Doc. 23, pg. 11; 24, pg. 9 n. 10; Doc. 34, pg. 10 n. 15).

Now, the Court must address a procedural tripwire, set by the parties without discussion, when drafting the Complaint and the briefing on the Motions to Dismiss. Federal Rule of Civil Procedure 8 "carefully distinguishes between" defenses that are denials in subpart (b) and affirmative defenses in subpart (c)(1). *See Luna Vanegas v. Signet Builders, Inc.*, 46 F.4th 636, 640 (7th Cir. 2022); Fed. R. Civ. P. 8(b), (c)(1). Under Rule 8(c)(1),

a defendant "[i]n responding to a pleading…*must* affirmatively state any…affirmative defense." *See* Fed. R. Civ. P. 8(c)(1) (Emphasis added). That rule "provides a nonexclusive list of such defenses" requiring the defendant to "come back with a responsive pleading," *i.e.*, to answer the complaint under Federal Rule of Civil Procedure 7(a)(2), "unless it is raising one of the seven defenses listed in Rule 12(b) as appropriate for a motion." *See Luna Vanegas*, 46 F.4th at 640. The Seventh Circuit has noted that affirmative defenses, like preemption, do not appear on Rule 12(b)'s list of defenses appropriate for a motion. *See id.*; *see also Doe v. GTE Corp.*, 347 F.3d 655, 657 (7th Cir. 2003) ("Affirmative defenses do not justify dismissal under Rule 12(b)(6)."); *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 645 (7th Cir. 2019) (noting preemption is an affirmative defense on which a defendant bears the burden of pleading and proof). Indeed, from the structure of the Rules and the plain language of Rule 8(c)(1), the Seventh Circuit stated: "It follows…an affirmative defense *must* be raised in the answer, not by motion." *See Luna Vanegas*, 46 F.4th at 640 (Emphasis added) (citing *Vazquez v. Indiana Univ. Health, Inc.*, 40 F.4th 582, 588 (7th Cir. 2022)); *accord King v. King*, No. 23-cv-355, 2023 WL 3346974, *6 (S.D. Ill. May 10, 2023); *Johnston v. Kashi Sales, L.L.C.*, 626 F. Supp. 3d 997, 1006 (S.D. Ill. 2007).

Further, in *Luna Vanegas*, the Seventh Circuit posited that "[t]here is real consequence to this structure" because a plaintiff, when drafting a complaint, is not required to anticipate or refute affirmative defenses. *See Luna Vanegas*, 46 F.4th at 640; *see also Bausch*, 630 F.3d at 561 (stating, in the case of a Class III medical device, the MDA, and the FDCA, "[p]reemption is an affirmative defense…and pleadings need not anticipate or attempt to circumvent affirmative defenses."). Also, motions under Rule

12(b)(6) are limited to instances where "the law does not confer a right to relief," and it is rare that "the face of the complaint [will] so clearly prove the opponent's affirmative defense that immediate dismissal, prior to the filing of an answer, will be proper." *See Luna Vanegas*, 46 F.4th at 640 (citing *Hecker v. Deere & Co.*, 556 F.3d 575, 588 (7th Cir. 2009)).

It is true, as a practical matter, courts have "taken shortcuts" when "the complaint leaves no doubt that there is a good" affirmative defense. *See id.* at 640, 645. However, the Seventh Circuit has emphasized, "it is safer to insist on compliance with the rules." *See id.* at 640; *accord Johnston*, 626 F. Supp. 3d at 1006. The "shortcut[]," which has been followed in this Circuit, has also been described as "a narrow and pragmatic exception" to the above-described structure of the Rules. *See Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 806 (7th Cir. 2020). Absent an application of that exception, which is available if a plaintiff pleads out of court, the proper vehicle for resolving an affirmative defense is a Rule 12(c) motion for a judgment on the pleadings after the filing of an answer. *See id.* (citing *Benson*, 944 F.3d at 645; *Burton v. Ghosh*, 961 F.3d 960, 964-65 (7th Cir. 2020); *Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009)); *accord Luna Vanegas*, 46 F.4th at 640; *H.A.L. NY Holdings, LLC v. Guinan*, 958 F.3d 627, 632 (7th Cir. 2020). A plaintiff pleads out of court if the complaint sets forth all that is necessary to satisfy the affirmative defense, *i.e.*, if the complaint "present[s] 'all relevant facts,' [citation], such that…[the plaintiff] has essentially 'admit[ted] all the ingredients of an impenetrable defense.' " *See Novotney v. Walgreen Co.*, No. 22-cv-3439, 2023 WL 4698149, *2 (N.D. Ill. July 20, 2023) (quoting *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs, Inc.*, 782 F.3d 922, 928 (7th Cir. 2015); *Brownmark*

*Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012); *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004)); *accord Luna Vanegas*, 46 F.4th at 640, 645.

If the "narrow and pragmatic" exception applies, "the difference between Rules 12(b)(6) and 12(c)…[may] be disregarded." *See Benson*, 944 F.3d at 645 (citing *Logan v. Wilkins*, 644 F.3d 577, 582-83 (7th Cir. 2011); *Brooks*, 578 F.3d at 579). Otherwise, the distinction between the rules is " 'necessary to allocate correctly the burdens of pleading and proof,' [citation], and serves an important notice function." *See Gunn*, 968 F.3d at 806 (quoting *H.A.L. NY Holdings, LLC*, 958 F.3d at 632); citing *Burton*, 961 F.3d at 964-65).

Here, the Court declines to dismiss Plaintiff's Complaint based on Defendants' affirmative defense of preemption. While Plaintiff positively addressed preemption in the Complaint and did not object to the Court's consideration of that affirmative defense under Rule 12(b)(6), the Court finds Plaintiff did not plead out of court for purposes of the "narrow and pragmatic" exception to the structure of Rules 8 and 12. *See King*, 2023 WL 3346974, *7 (noting the Seventh Circuit's statements in *Benson*, *Luna Vanegas*, and *Gunn*, including the necessity of observing the distinction between Rules 12(b)(6) and (c), before declining to dismiss the plaintiff's claims based on a preemption affirmative defense under Rule 12(b)(6)); *Johnston*, 626 F. Supp. 3d at 1006 (same, and also finding, in the context of the FDCA and FDA regulations, the plaintiff did not plead herself out of court); *Crawford v. AriZona Beverages USA LLC*, No. 22-cv-220, 2023 WL 1100260, *6 (S.D. Ill. Jan. 30. 2023) (declining, under *Benson* and *Luna Vanegas*, to determine whether, in the context of the FDCA and FDA regulations, a preemption affirmative defense barred the plaintiff's claims under Rule 12(b)(6), where, *inter alia*, a motion for a judgment on the

14

pleadings was the appropriate way to address preemption since the plaintiff did not plead out of court and the difference between Rule 12(b)(6) and (c) could not be disregarded). Notably, Defendants do not identify or address the procedural quirks related to their Motions to Dismiss, let alone suggest Plaintiff pled out of Court under the stringent standard articulated above. *See Williams v. City of Chicago*, No. 22-cv-1084, 2022 WL 3716214, *6 (N.D. Ill. Aug. 29, 2022) (declining to consider affirmative defense of immunity under Rule 12(b)(6), where such a consideration would be "procedurally improper," would require ignoring the "clear pronouncement" of the Seventh Circuit in *Gunn* and *Luna Vanegas*, and the defendants did not argue the plaintiff pled out of court for purposes of disregarding the difference between Rule 12(b)(6) and (c)).

Further, the Court notes that this is a complex product liability case involving various federal and state law requirements. It cannot seriously be doubted that compliance with the mandates of the Rules, including through the filing of an answer and participation in discovery, will serve to flesh out Plaintiff's detailed factual allegations related to, *inter alia*, those requirements and the pre- and post-PMA process. It is notable, at least at the time of the Complaint, "Plaintiff d[id] not have access to the complete Filshie Clip PMA approval order, Femcare's PMA application, specific post approval requirements, or any supplementary orders[] along with specified requirements listed therein." (Doc. 1, pg. 17 n. 3). Plaintiff indicated, once she "obtain[ed] [the] PMA approval order and related documents through discovery, Plaintiff w[ould] amend th[e] Complaint based on the specific requirements set forth therein as necessary." (Doc. 1, pg. 17 n. 3). As noted above, in cases alleging the defective manufacture of a

medical device, "courts must keep in mind that much of the product-specific information about manufacturing needed to investigate such a claim fully is kept confidential by federal law," such that formal discovery is necessary before a plaintiff can fairly be expected to make detailed statements on the specific bases of her claims. *See Bausch*, 630 F.3d at 558. Compliance with the Rules will identify and contextualize the precise nature of the aforementioned requirements, which are vital to preemption and, perhaps tellingly, have been discussed by the parties in fairly broad terms to this point in the case. Thus, the Court declines to take the "shortcut[]," identified in *Luna Vanegas*, and instead finds it safer to insist on compliance with the Rules. *See Luna Vanegas*, 46 F.4th at 640.

### 2. Breaches of the FDA Regulations Under Illinois Law

Defendants argue, while Illinois recognizes a duty to warn about medical devices, it extends only to prescribing physicians. (Docs. 21, pg. 11; 22, pg. 19; 32, pg. 18). According to Defendants, Plaintiff has not identified a duty to warn governmental agencies of potential damages caused by medical devices. (Docs. 21, pg. 11; 22, pg. 19; 32, pg. 19). Plaintiff disagrees, claiming the duty to warn requires product manufacturers to engage in reasonable conduct for the benefit of end users. (Doc. 23, pg. 13; 24, pg. 19; Doc. 34, pgs. 19-20). She claims that includes compliance with FDA disclosure requirements. (Doc. 23, pg. 13; 24, pg. 19; Doc. 34, pgs. 19-20).

As noted at footnote 3, a violation of a statute, designed to protect human life, is *prima facie* evidence of negligence in Illinois. *See Bausch*, 630 F.3d at 553. Also, Illinois recognizes negligence and strict liability claims arising from a manufacturer's failure to disclose known defects in a product. *See Laverty*, 197 F. Supp. 3d at 1032 (citing *Woodill*,

79 Ill. 2d at 29); *Hernandez*, 2011 IL App (1st) 093306, ¶ 38). The associated duty, which is not limited to issuing warnings directly to end users, looks to the relationship of the parties and assesses whether the defendant had an obligation of reasonable conduct for the benefit of the plaintiff. *See id*. at 1035 (quoting *Solis*, 2012 IL App (1st) 110875, ¶ 64). And, notable here, all persons in the distributive chain may be liable in a product liability action in Illinois. *See Smith*, 894 F. Supp. 2d at 1093 (quoting *Hammond*, 97 Ill. 2d at 195). Again, the MDA did not "eviscerate the longstanding state-imposed duty to warn simply by redefining the way medical device manufacturers satisfy that obligation." *See id*.

In light of these legal principles, the Court rejects Defendants' arguments at this stage in the case. Plaintiff alleged enough facts to state a facially plausible claim for relief against Defendants. *See Kloss*, 462 F. Supp. 3d at 876; *Fosnight*, 41 F.4th at 921-22); *Bausch*, 630 F.3d at 558.

### 3. The Statue of Limitations

Defendants argue Plaintiff cannot benefit from the discovery rule to excuse compliance with the statute of limitations. *See* 735 ILCS 5/13-213(d); (Docs. 21, pg. 10; 22, pg. 16; 32, pg. 16). They argue Plaintiff's claims accrued when she began experiencing severe pain from the tubal ligation procedure that implanted the Filshie Clips. (Docs. 21, pg. 10; 22, pg. 17; 32, pg. 16). Defendants note, according to Plaintiff, the "severe pain" began "shortly after" the tubal ligation procedure, which occurred at some time in 2015. (Docs. 21, pg. 10; 22, pg. 17; 32, pg. 16). Defendants also note this case was filed approximately 7 years after that procedure. (Docs. 21, pg. 10; 22, pg. 17; 32, pg. 16).

In response, Plaintiff argues Defendants' failure to disclose to the FDA that Filshie Clips had a migration rate of 25%, not .13%, meant Plaintiff and her healthcare providers were deprived of sufficient information related to the risk of injury and pain. (Doc. 23, pg. 12; 24, pg. 19; Doc. 34, pg. 19). Plaintiff notes that deprivation of information resulted in her choice to undergo the tubal ligation procedure that implanted the Filshie Clip, which resulted in "severe pain" for which the cause was unknown. (Doc. 23, pg. 12; 24, pg. 19; Doc. 34, pg. 19). Plaintiff suggests it was not until August 2020 that she discovered a Filshie Clip was causing her pain. (Doc. 23, pg. 12; 24, pg. 19; Doc. 34, pg. 19).

Section 13-213(d) of the Illinois Code of Civil Procedure provides: "[I]f the injury complained of occurs within any of the periods provided by subsection (b) and paragraph (2) of subsection (c), the plaintiff may bring an action within 2 years after the date on which the claimant knew, or through the use of reasonable diligence should have known, of the existence of the personal injury." *See* 735 ILCS 5/13-213(d). Obviously, applying this statutory provision requires a highly factual analysis. Therefore, as with preemption, Defendants hit a procedural snag when invoking the affirmative defense of untimeliness under Section 13-213(d). *See Sidney Hillman Health Center of Rochester v. Abbott Labs, Inc.*, 782 F.3d 922, 928 (7th Cir. 2015).

A dismissal of a complaint as untimely under Rule 12(b)(6) is an "unusual step," as a complaint need not anticipate or attempt to circumvent affirmative defenses and the analysis usually depends upon facts not before the Court. *See id.* (quoting *Cancer Foundation, Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009); *Brownmark Films, LLC*, 682 F.3d at 690); *accord Rokowsky v. Vericity, Inc.*, 632 F. Supp. 3d 797, 805 (N.D.

18

Ill. 2022); *see also Perry v. Sullivan*, 207 F.3d 379, 382 (7th Cir. 2000) ("Rule 8 specifically requires statute of limitations defenses to be stated in the defendant's responsive pleading."). Of course, as with preemption, an exception applies when the plaintiff pleads out of court. *See Sidney*, 782 F.3d at 928 (quoting *O'Gorman v. City of Chicago*, 777 F.3d 885, 889 (7th Cir. 2015); citing *Cancer Foundation, Inc.*, 559 F.3d at 674); *accord Rokowsky*, 632 F. Supp. 3d at 805. However, the Seventh Circuit has cautioned that applying the exception is the " 'irregular' approach." *See Sidney*, 782 F.3d at 928 (quoting *Chicago Building Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 613-14 (7th Cir. 2014); citing *U.S. v. N. Trust Co.*, 372 F.3d 886, 888 (7th Cir. 2004)). If there is "a conceivable set of facts" that defeats the affirmative defense of untimeliness, then questions of timeliness are left for summary judgment or trial, when the analysis may be conducted "based on a more complete factual record." *See id.* (citing *Clark v. Braidwood*, 318 F.3d 764, 767 (7th Cir. 2003); *Early v. Bankers Life & Cas. Co.*, 959 F.2d 75, 80 (7th Cir. 1992)); *accord Rokowsky*, 632 F. Supp. 3d at 805.

In light of these authorities, and the fact that there is clearly "a conceivable set of facts" that defeats Defendants' affirmative defense of untimeliness under Section 13-213(d), the Court declines to take the "unusual step" of dismissing the Complaint under Rule 12(b)(6). *See Sidney*, 782 F.3d at 928; *Rokowsky*, 632 F. Supp. 3d at 805.

### 4. UMP as the Parent Company of Femcare

Defendant UMP concedes it is the parent company of Defendant Femcare, which is the manufacturer of Filshie Clips. (Doc. 22, pg. 8). However, Defendant UMP argues Plaintiff cannot maintain this action against an uninvolved parent company. (Doc. 22, pg. 8). Plaintiff notes the two exceptions to this general legal principle, related to the direct

19

liability of the parent company or its control over the misconduct, are inapplicable under the circumstances of this case. (Doc. 22, pg. 8). In short, Defendant UMP argues it cannot be liable for any general oversight of Defendant Femcare. (Doc. 22, pg. 8). Defendant UMP reminds the Court that Defendant Femcare has its own corporate headquarters in Romsey, Hampshire, England, and it is a separate and distinct legal entity. (Doc. 22, pg. 9). Defendant UMP also suggests Plaintiff makes no allegation that it was involved with the Filshie Clips utilized in Plaintiff's tubal ligation procedure. (Doc. 22, pg. 9).

Here, the Court declines to dismiss Plaintiff's claims against Defendant UMP based on its conclusory argument that it is an "uninvolved" parent company. In other words, the Court declines Defendant UMP's invitation to decide a merits question, *i.e.*, whether it is directly or indirectly liable, on the pleadings before discovery. In so declining, though, the Court notes Defendant UMP acquired Defendant Femcare, the manufacturer of Filshie Clips, in 2011, at which time Defendant Femcare had a distribution agreement with Defendant CooperSurgical to market and sell Filshie Clips in the United States. In 2019, Defendant UMP acquired the distribution rights to Filshie Clips in the United States. As is discussed in more detail below, the record indicates Defendant UMP benefitted financially from the marketing and sale of Filshie Clips in the United States between 2011, when it "merge[d]" with Defendant Femcare, and the present. (Doc. 24-5, pgs. 4, 13). Also, the Court notes that Defendants' post-PMA misconduct allegedly prevented Plaintiff from discovering her injuries until 2020, at which time Defendant UMP was undisputedly the distributor of Filshie Clips in the United States. Therefore, at present, the Court finds Plaintiff satisfied her light burden of

alleging enough facts to state a facially plausible claim for relief against Defendant UMP. *See Kloss*, 462 F. Supp. 3d at  876; *Fosnight*, 41 F.4th at 921-22; *Bausch*, 630 F.3d at 558.

## B. Personal Jurisdiction

In a Rule 12(b)(2) motion, a defendant may assert a lack of personal jurisdiction. The plaintiff bears the burden of proof in response. *See Rogers v. City of Hobart, Indiana*, 996 F.3d 812, 818 (7th Cir. 2021) (citing *Curry v. Revolution Labs., LLC*, 949 F.3d 385, 392-98 (7th Cir. 2020)). If all factual disputes are resolved for the plaintiff, then the Court may decide the motion, without a hearing, on the parties' written materials. *See McAdams v. Daedong Indust. Co. Ltd.*, 409 F. Supp. 3d 660, 663 (S.D. Ill. 2019) (citing *Purdue Research Foundation v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003); *uBID, Inc. v. GoDaddy Group, Inc.*, 623 F.3d 421, 423-24 (7th Cir. 2010)). The plaintiff must make a *prima facie* case of personal jurisdiction. *See id.* (citing *Purdue Research Foundation*, 338 F.3d at 782); *see also Karraker v. Rent-A-Center, Inc.*, 239 F. Supp. 2d 828, 839 (C.D. Ill. Jan. 8, 2003) ("Plaintiffs need only assert a prima facie case of personal jurisdiction…and the motion will be denied if Plaintiffs allege 'sufficient facts to support a reasonable inference' that Defendants can be subjected to th[e] court's personal jurisdiction.").

Relevantly, specific personal jurisdiction requires "minimum contacts" between the defendant and the forum state, *i.e.*, " 'an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.' " *See In re Sheehan*, 48 F.4th 513, 522 (7th Cir. 2022) (quoting *Bristol-Myers Squibb Co. v. Superior Ct.*, 528 U.S. 255, 262 (2017)); *Rogers*, 996 F.3d at 818. The Seventh Circuit has stated the following requirements

for specific personal jurisdiction: (1) the defendant must purposefully direct its activities at the forum state or purposefully avail itself of the privilege of conducting business in the forum state; (2) the injury alleged by the plaintiff must arise out of or relate to the defendant's activities in the forum state; and (3) the Court's exercise of specific personal jurisdiction must comport with traditional notions of fair play and substantial justice. *See In re Sheehan*, 48 F.4th at 522 (citing *Rogers*, 996 F.3d at 819; *Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010)); *see also Rogers*, 996 F.3d at 818 ("Because the Illinois long-arm statute extends as far as the Constitution permits, [citation], we need only look to whether exercising personal jurisdiction here would comport with federal due process.").

As to the first requirement for specific personal jurisdiction, the Court focuses on the acts of the defendant and not those of the plaintiff or third parties. *See In re Sheehan*, 48 F.4th at 522-23 (citing *Walden v. Fiore*, 571 U.S. 277, 284 (2014); *NBA Properties, Inc. v. HANWJH*, 46 F.4th 614, 620-21 (7th Cir. 2022)). The defendant's relationship with the forum state must arise out of its contacts with the forum state. *See id*. at 522-23 (quoting *Walden*, 571 U.S. at 284; citing *Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano County*, 480 U.S. 102, 109 (1987)); *accord Rogers*, 996 F.3d at 819. The plaintiff cannot be "the only link" to the forum state. *See In re Sheehan*, 48 F.4th at 523 (citing *Walden*, 571 U.S. at 285).

Also, particularly relevant here, the Seventh Circuit applies the stream of commerce theory, articulated in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980), as a means of satisfying the first requirement for specific personal jurisdiction in product liability cases. *See J.S.T. Corp. v. Foxconn Interconnect Tech. Ltd.*, 965 F.3d 571, 575 (7th Cir. 2020); *accord Dehmlow v. Austin Fireworks*, 963 F.2d 941, 946 (7th Cir. 1992);

*see also Neterval-Quiel v. CMC SRL*, No. 21-cv-1279, 2022 WL 4131921, *3 (E.D. Wisc. Sept. 12, 2022) (stating the stream of commerce theory is a method for satisfying the first requirement for specific personal jurisdiction); *Felland v. Clifton*, 682 F.3d 665, 674 (7th Cir. 2012) ("[T]he nature of the purposeful-direction/purposeful-availment inquiry depends in large part on the type of claim at issue."). This is despite other Circuits splitting on the continued viability of the theory and the Supreme Court, in two cases, being unable to resolve that split. *See J.S.T. Corp.*, 965 F.3d at 575 (citing *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873 (2011); *Asahi Metal Indus. Co.*, 480 U.S. 102); *Dehmlow*, 963 F.2d at 946. The Seventh Circuit has stated: "In the absence of intervening guidance from the Supreme Court, we have reasoned that the Court adopted the stream of commerce theory…and has not overruled it since." *See J.S.T. Corp.*, 965 F.3d at 575-76 (citing *Dehmlow*, 963 F.2d at 946-47; *Jennings v. AC Hydraulic A/S*, 383 F.3d 546, 550 n. 2 (7th Cir. 2004)).

Under the stream of commerce theory, specific personal jurisdiction "may be appropriate over 'a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.' " *See J.S.T. Corp.*, 965 F.3d at 575 (quoting *World-Wide Volkswagen Corp.*, 444 U.S. at 297-98); *see also Jennings*, 383 F.3d at 550 ("If a defendant delivers products into a stream of commerce, originating outside the forum state, with the awareness or expectation that some of the products will be purchased in the forum state, that defendant may be subject to specific [personal] jurisdiction in the forum state."); *accord Neterval-Quiel*, 2022 WL 4131921, *3; *see also Morris v. Daimler Trucks North America, LLC*, No. 20-cv-246, 2020 WL 4436330, *4 (S.D. Ill. Aug. 3, 2020) (stating courts in the Seventh Circuit still apply the "less

stringent" stream of commerce theory in product liability cases, meaning, "if a products liability defendant in a court in Illinois is aware and expects its product to be marketed and regularly sold in Illinois in the stream of commerce, it will be subject to personal jurisdiction in Illinois."). By way of an example of the stream of commerce theory, the Seventh Circuit has found personal jurisdiction in a product liability lawsuit where "a defendant sold fireworks to a middleman 'with the knowledge that its fireworks would reach Illinois consumers in the stream of commerce.' " *See J.S.T. Corp.*, 965 F.3d at 576.

Such downstream sales to consumers can support specific personal jurisdiction because the sales bear on the relationship between the defendant, the forum, and the litigation. *See id.* (quoting *Walden*, 571 U.S. at 277). The defendant must have minimum contacts with the forum state and the litigation must arise from those minimum contacts. *See id.* In a product liability case, the underlying allegation relates to the development of a product that is harmful to consumers. *See id.* Therefore, if the defendant takes steps to reach consumers in the forum state, it has created a relationship with the forum state that has "special relevance" to the litigation. *See id.; accord Forde*, 2021 WL 148877, *6; *see also Morris*, 2020 WL 4436330, *4 (stating, under *J.S.T. Corp.*, if a defendant places a product in the stream of commerce "with the awareness and expectation that it could reach Illinois consumers…, and the litigation arose out of those downstream sales, [then] the Court has specific personal jurisdiction."). The point of consumer sale is relevant to the relationship between the defendant, the forum state, and the litigation, even if the product travels through middlemen before reaching the consumers. *See J.S.T. Corp.*, 965 F.3d at 576.

Further, in the context of the second requirement for specific personal jurisdiction, the Seventh Circuit has "declined to definitively resolve" what is required to prove a causal connection between the plaintiff's injury and the defendant's activities in the forum state, but it "suggested in passing that a mere 'but for' causal relationship is insufficient to establish the required nexus." *See Felland*, 682 F.3d at 676-77; *accord Lab Verdict, Inc. v. Lab Equip Ltd.*, 436 F. Supp. 3d 1181, 1188-89 (S.D. Ind. 2020). Also, as to the third requirement for specific personal jurisdiction, the Court considers the inconvenience to the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining an efficient resolution of the controversy, and the shared interests of the States in advancing fundamental substantive social policies. *See Rogers*, 996 F.3d at 819 (quoting *Curry*, 949 F.3d at 396); *accord Dehmlow*, 963 F.2d at 945. The defendant cannot be put "at a severe disadvantage" by the jurisdictional rules; however, if the defendant purposefully directed its activities at the forum state or availed itself of the privilege of conducting business in the forum state, then the defendant must make a compelling showing that the circumstances render specific personal jurisdiction unreasonable. *See Felland*, 682 F.3d at 677 (quoting *Burger King Corp.*, 471 U.S. at 477).

Finally, the Court notes, in *Jennings*, the Seventh Circuit discussed the situation in which a foreign manufacturer was a defendant in a product liability case. The Seventh Circuit stated, "[w]ith the free flow of commerce within the United States today, it may seem counterintuitive that a foreign manufacturer…sell[ing] goods to a distributor in the United States should not be assumed to have the expectation that its goods may end up

for sale in any one of the fifty states." *See Jennings*, 383 F.3d at 551. However, the Seventh

Circuit noted, as was stressed in *World-Wide Volkswagen*, State lines are not irrelevant for

purposes of jurisdiction, even though the United States is meant to be a common market.

*See id*. (quoting *World-Wide Volkswagen Corp.*, 444 U.S. at 293). The minimum contacts

requirement protects a nonresident defendant in a diversity case. *See id*. Personal

jurisdiction cannot be exercised over such a nonresident defendant if it lacks minimum

contacts with the forum state. *See id*. (quoting *Burger King Corp.*, 471 U.S. at 474).

## 1. Defendant UMP

Defendant UMP argues Plaintiff provides "mere formulaic recitations" of personal

jurisdiction without discussing its contacts with Illinois or Filshie Clips. (Doc. 22, pg. 2).

Defendant UMP argues, at all relevant times, it did not do business related to Filshie Clips

or engage in purposeful contacts with physicians in Illinois. (Doc. 22, pgs. 3, 6). Defendant

UMP submitted the Declaration of Mr. Kevin Cornwell, the Chairman and CEO of

Defendant UMP, who noted Defendant UMP acquired Defendant Femcare in 2011. (Doc.

21, pgs. 6, 13-14). However, Mr. Cornwell states Defendant UMP "did not design,

research, conduct safety surveillance, develop, manufacture, test, label, package,

distribute, market, or sell the Filshie Clips utilized in plaintiff['s]…2015 tubal ligation

[procedure]." (Doc. 22, pgs. 13-14). Mr. Cornwell indicates it was not until February 2019,

when Defendant UMP purchased the distribution rights of Defendant CooperSurgical,

that Defendant UMP directly sold Filshie Clips to medical facilities in the United States.

(Doc. 22, pg. 14). Before that time, Mr. Cornwell attests that Defendant UMP "did not sell

or market the Filshie Clips in Illinois or elsewhere…[and] was not involved in the sale or marketing of the Filshie Clips involved in this lawsuit." (Doc. 22, pg. 14).

In response, Plaintiff attacks Mr. Cornwell's "carefully worded" Declaration. (Doc. 24, pg. 10). First, Plaintiff notes Defendant UMP has owned Defendant Femcare, the manufacturer of Filshie Clips, since 2011. (Doc. 24, pg. 10). Plaintiff suggests Defendant UMP has been profiting from the sale of Filshie Clips in the United States, including in Illinois, since that time. (Doc. 24, pg. 10). Defendant admits, though, she is unaware of how many Filshie Clips have been sold in Illinois. (Doc. 24, pg. 10). However, since Defendant UMP touts Filshie Clips as a globally recognized and recommended product that is sold in the United States, and Filshie Clips have been sold in significant numbers in the United States since 2011, Plaintiff argues it is reasonable to conclude that Filshie Clips have also been sold in significant numbers in Illinois. (Doc. 24, pgs. 10-11).

Second, Plaintiff notes Defendant UMP *currently* sells, markets, and distributes Filshie Clips in Illinois. (Doc. 24, pg. 10). Indeed, Defendant UMP has done so since 2019, when it purchased the distribution rights from Defendant CooperSurgical. (Doc. 24, pg. 10). Further, Plaintiff argues Defendant UMP, as the seller and distributor of Filshie Clips since 2019, is subject to the regulations of the FDA. (Doc. 24, pg. 11). Therefore, Plaintiff submits Defendant UMP had an obligation to continuously monitor, market, and report complaints or adverse health consequences related to Filshie Clips in a manner consistent with the PMA and the FDA regulations. (Doc. 24, pg. 11). The failure to do so allegedly led to Plaintiff "not knowing the source of her injuries for years." (Doc. 24, pg. 10).

## 2. Defendant Femcare

Defendant Femcare argues Plaintiff states "mere formulaic recitations" of personal jurisdiction without discussing its contacts with Illinois or Filshie Clips. (Doc. 32, pg. 2). Defendant Femcare notes its principal place of business is in England. (Docs. 32, pg. 2; 32-1, pg. 1). It was acquired by Defendant UMP in 2011, but it remains a separate legal entity. (Docs. 32, pgs. 2-3; 32-1, pg. 1). Defendant Femcare is the manufacturer of Filshie Clips, but it did not design, research, conduct safety surveillance, develop, manufacture, test, label, package, distribute, market, or sell Filshie Clips in Illinois. (Doc. 32-1, pg. 2). Defendant Femcare states it did not sell Filshie Clips "with the intent that they be used by medical professionals treating patients in Illinois." (Doc. 32-1, pg. 2). As such, Defendant Femcare argues it does no business or advertising in Illinois, and it has not directed the distribution of Filshie Clips in that State. (Docs. 32, pg. 3; 32-1, pg. 2). Also, Defendant Femcare states it does not derive substantial revenue in Illinois. (Doc. 32-1, pg. 2). At the time of Plaintiff's procedure, Defendant CooperSurgical "distributed Filshie Clips in the United States." (Doc. 32-1, pg. 2). These assertions are stated in the Declaration of Paul Hill, who is a Director of Defendant Femcare. (Doc. 32-1).

Contrary to these arguments, Plaintiff argues the Court has personal jurisdiction over Defendant Femcare because her injuries arose from a product that Defendant Femcare manufactured and distributed to Illinois residents. (Doc. 34, pg. 11). Plaintiff notes Defendant Femcare applied for FDA approval in 1996 for the purpose of selling Filshie Clips in the United States. (Doc. 34, pg. 11). Upon receiving PMA, Defendant Femcare entered an exclusive distribution agreement with Defendant CooperSurgical in

2003, and then subsequently entered a similar agreement with Defendant UMP in 2019. Plaintiff notes, by virtue of those agreements, Defendants CooperSurgical and UMP distributed Filshie Clips in the United States from 2003 to the present. (Doc. 34, pg. 11). Notwithstanding "the intent" of Defendant Femcare, as described by Mr. Hill in his Declaration, Plaintiff argues Defendant Femcare knew Filshie Clips were sold to and utilized by women in Illinois. (Doc. 34, pg. 14). By extension, Plaintiff argues Defendant Femcare profited from the sale and use of Filshie Clips in Illinois. (Doc. 34, pgs. 13-14). Plaintiff notes Defendant UMP, in an Answer to an Interrogatory in another case with Defendants stated, "Filshie Clips have likely been sold in all US states." (Doc. 34-9, pg. 3).

Also, Defendant Femcare allegedly retained control over the sale, distribution, marketing, and safety of Filshie Clips, despite the distribution agreements. (Doc. 34, pgs. 11-14, 17-18). Plaintiff states "Femcare purposefully entered into a contract that allowed it to retain a great amount of control over its product, including determining the markets in which the Filshie Clips were sold, the actual marketing of the product, and [the] training [of] individuals who would be selling the product in the U.S." (Doc. 34, pg. 13).

### 3. Application to Defendants UMP and Femcare

Resolving all specific personal jurisdiction factual disputes for Plaintiff, the Court finds she made a *prima facie* case of specific personal jurisdiction over Defendants UMP and Femcare. *See McAdams*, 409 F. Supp. 3d at 663; *Karraker*, 239 F. Supp. 2d at 839. As to the first requirement, Plaintiff provides sufficient facts to show Defendants UMP and Femcare delivered Filshie Clips into the stream of commerce with the awareness or expectation that they would be used by Illinois patients. *See World-Wide Volkswagen Corp.*,

444 U.S. at 297-98; *J.S.T. Corp.*, 965 F.3d at 575; *Jennings*, 383 F.3d at 550. Notably, Filshie Clips received PMA in 1996. Defendant Femcare, the manufacturer of Filshie Clips and a subsidiary of Defendant UMP since 2011, was a party to distribution agreements with Defendant CooperSurgical from 2003 to 2019 and Defendant UMP from 2019 to the present. The agreements targeted customers in the United States, broadly, but it is undeniable Filshie Clips reached Illinois, specifically. In 2015, Filshie Clips reached Illinois for the use by Plaintiff's doctor in her tubal ligation procedure. As Plaintiff notes, however, Filshie Clips assuredly reached Illinois at other times, too, as Defendant UMP admitted in another 2022 case, involving these Defendants, "Filshie Clips have likely been sold in all US states." *See Rebando v. CooperSurgical, Inc., et al.*, No. 22-cv-177 (M.D. Fla. 2022); *see also O'Neal v. Bumbo Intern. Trust*, 16 F. Supp. 3d 952, 958-59 (S.D. Ind. 2014) (finding, unlike in *Jennings*, the defendant acknowledged, *inter alia*, its products were sold in the forum state); (Doc. 34-9, pg. 3).

Certainly, the distribution agreements and other record evidence indicate Defendant Femcare benefitted financially from the marketing and sale of Filshie Clips in the United States, including in Illinois, from 2003 to the present. Defendant Femcare's Director, Mr. Hill, attested to these circumstances, stating Filshie Clips were not sold "*with the intent* that they be used…in Illinois," were not *directed* for distribution in Illinois, and did not "derive *substantial* revenue" in Illinois. (Doc. 32-1, pg. 2). (Emphasis added.). Mr. Hill essentially suggests, by reverse inference, Filshie Clips were, indeed, used by, distributed to, and a source of revenue in Illinois by virtue of Defendant Femcare's distribution agreements with Defendants CooperSurgical and UMP. (Doc. 32-1, pg. 2).

Likewise, the record evidence suggests Defendant UMP benefitted financially from the distribution agreements and resultant marketing and sale of Filshie Clips in the United States between 2011 and 2019, as the parent company of Defendant Femcare, and between 2019 and the present, as the distributor and "direct[] market[er]" of that product in the United States. (Doc. 24-10, pgs. 9, 11). On its website, Defendant UMP described Filshie Clips as "one of the most popular permanent sterilization methods in the United States." (Doc. 24-3, pg. 2). Also, in its Annual Report for 2011, Defendant UMP described its acquisition of Defendant Femcare as a "merger" and noted the following in relation to gynecology, electrosurgery, and urology ("ES/gyn") sales in the United States:

> ES/gyn sales in 2011…[w]ith Femcare…increased 226%. U.S. domestic sales increased 60%…. The domestic sales increase was primarily due to sales to Cooper Surgical Inc., which has an agreement with Femcare for distribution of the Filshie Clip System in the U.S. Cooper Surgical is now… [UMP's] largest customer, with 2011 sales of $2.2 million, about 6% of total…[UMP] sales.

(Doc. 24-5, pgs. 4, 13).

In 2012, Defendant UMP desired to "realize distribution and manufacturing synergies by integrating capabilities and resources obtained in its recent acquisition of Femcare." (Doc. 24-5, pg. 20). Further, as Plaintiff notes, Defendant UMP indicated in its Form 10-K for fiscal year 2015, which was filed with the United States Securities Exchange Commission, that it "acquired the Filshie Clip System as part of its acquisition of Femcare in March 2011. In 2015, sales of Filshie Clips, applicators and accessories represented 35% of…[Defendant UMP's] U.S. Dollar denominated sales." (Doc. 24-2, pg. 8). It is also notable, again, that Defendant UMP admitted in another 2022 case, involving these

31

Defendants, "Filshie Clips have likely been sold in all US states." *See Rebando*, No. 22-cv-177; (Doc. 34-9, pg. 3). These facts suggest, in 2015, Defendant UMP was not nearly as separated from Defendant Femcare or Filshie Clips as its present arguments suggest.

Further, the Court emphasizes that it is undisputed, as of early 2019, Defendant UMP was charged with distributing Filshie Clips across the United States. Indeed, Mr. Cornwell noted, "*[b]efore February 2019,*" [UMP] did not sell or market the Filshie Clips in Illinois or elsewhere." (Doc. 21, pg. 14) (Emphasis added.). In other words, by that time, Defendant UMP was not a mere parent company of Defendant Femcare; instead, it was firmly positioned in the chain of distribution in the United States, including in Illinois. This is important because Plaintiff alleges Defendants' post-PMA conduct prevented the discovery of her injury, caused by a detached and migrating Filshie Clip, until 2020.

Also, the above-discussed sales, stemming from the distribution agreements, are akin to those discussed in *J.S.T. Corp.* and are not "merely 'random, fortuitous, or attenuated contacts'" with Illinois. *See Tamburo*, 601 F.3d at 702; *see also O'Neal*, 16 F. Supp. 3d at 959 ("There is nothing random, fortuitous, or attenuated about…[the Defendant's] use of a distribution network that it knows results in the sale of" a product in the forum state). The sales bear on the relationship between Defendants, the State of Illinois, and the litigation filed by Plaintiff because Defendant Femcare, as the manufacturer of Filshie Clips, and Defendant UMP, as the parent company of Defendant Femcare and the actual distributor of Filshie Clips, profited from agreements to market and sell Filshie Clips in the United States, including in Illinois, where the use of the product in a tubal ligation procedure allegedly harmed Plaintiff. *See J.S.T. Corp.*, 965 F.3d at 576. In other words,

Defendants took steps to reach patients in Illinois, which created a relationship of "special relevance" between Defendants and Illinois. *See id.*; *Morris*, 2020 WL 4436330, *4.

And, critically, it is inconsequential that Filshie Clips traveled from Defendant Femcare, through Defendant CooperSurgical or Defendant UMP, to Plaintiff. *See J.S.T. Corp.*, 965 F.3d at 576; *see also O'Neal*, 16 F. Supp. 3d at 959 ("If…[a defendant] utilizes a distribution network for its…[product] 'with the expectation that they will be purchased by consumers in [the forum state],' [citation], it has purposefully availed itself of the privilege of conducting business in" the forum state); *Richter v. INSTAR Enterprises Intern., Inc.*, 594 F. Supp. 2d 1000, 1014 (N.D. Ill. 2009) ("[I]f the sale of the product of a manufacturer or distributor is not simply an isolated occurrence, 'but arises from the[ir] efforts…to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States.' "). For these reasons, the Court finds Plaintiff has adequately shown Defendants UMP and Femcare purposefully directed their activities at Illinois and availed themselves of the privilege of conducting business in this State. *See In re Sheehan*, 48 F.4th at 522; *see also Sagez v. Columbus McKinnon Corp.*, No. 14-cv-1397, 2016 WL 11634571, *5 (S.D. Ill. Dec. 9, 2016) (finding the evidence supported an inference that Defendants knew and intended for a product to be purchased in Illinois, where, *inter alia*, the product arrived in Illinois through an established distribution system, the defendants had an agreement to "sell[] 'to the United States of America,' " that language "include[d] all fifty states," the defendants had "ample reason to know and expect" the product would be marketed in "*any* or *all* states" due to the established distribution system, the defendant distributor purchased 250,000 units of the

product over ten years from the other defendants, sales of the product in the United States totaled around four million dollars a year in recent years, the defendant distributor evinced that a "substantial number" of the product were sold in Illinois over 10 years, the defendant manufacturer and defendant distributor garnered "significant income" from their contacts with Illinois, and the defendant marketer received regular updates on the marketing and sale of the product in the United States) (Emphasis in original.); *compare Jennings*, 383 F.3d at 550-51 (noting, in response to stream of commerce argument, the Court did not know how the product arrived in the state or whether the product was sold in that state, where, *inter alia*, the plaintiff produced *no evidence* that the defendant's products were sold in the state and presented *no information* as to the volume of sales to or the resale of the product by distributors, such that the scope of any distribution in the United States or the state could not be determined); *Richter*, 594 F. Supp. 2d at 1016-17 (noting, unlike in other stream of commerce cases, the plaintiff presented *no evidence* the defendant sold the product with an expectation of serving a broader market, derived direct benefits from that market, knew purchasers would likely resell the product in Illinois, or caused the product to enter Illinois in quantities establishing a predictable distribution pattern from which the defendant's awareness could be assumed).

Next, as to the second requirement for specific personal jurisdiction, the record indicates Defendant Femcare manufactured and, via its distribution agreement with Defendant CooperSurgical, marketed and sold Filshie Clips in the United States, including in Illinois. The record also indicates in 2015, as a result of Defendant Femcare's Illinois activities, Plaintiff underwent a tubal ligation procedure, during which Plaintiff's

doctors implanted her with Filshie Clips. Sometime thereafter, Plaintiff allegedly suffered injuries from the detachment and migration of a Filshie Clip from her fallopian tubes. Importantly, Plaintiff alleges Defendants' post-PMA misconduct prevented the discovery of her injuries until 2020, when Defendant UMP was undisputedly the distributor of Filshie Clips in the United States, including in Illinois. As such, even under a strict understanding of the second requirement for specific personal jurisdiction in Plaintiff's *prima facie* case, the Court finds she has sufficiently shown her injuries arose out of or relate to Defendant Femcare and UMP's activities in Illinois. *See In re Sheehan*, 48 F.4th at 522; *Felland*, 682 F.3d at 676-77; *Lab Verdict, Inc.*, 436 F. Supp. at 1188-89; *see also Sagez*, 2016 WL 11634571, *5 (finding second requirement for specific personal jurisdiction was met, where "[t]he subject chain hoist was sold through an established distribution channel to a customer in Illinois, and it was involved in an accident that took place in…Illinois.").

Finally, as to the third requirement for specific personal jurisdiction, Plaintiff's alleged injuries, stemming from the detachment and migration of a Filshie Clip that was implanted on her fallopian tubes in 2015, occurred in Illinois after that product arrived in the State through the stream of commerce. Illinois has an interest in rectifying injuries to its citizens like Plaintiff, allegedly caused by the use of products arriving in the State through steps taken by Defendants. Similarly, Illinois has an interest in providing citizens like Plaintiff with convenient and effective relief. The Court finds Defendants Femcare and UMP have failed to make a compelling showing that their foreign statuses outweigh these important interests, such that an exercise of specific personal jurisdiction would be unreasonable. *See Felland*, 682 F.3d at 677. Therefore, for all of the reasons discussed in

this section, the Court concludes an exercise of specific personal jurisdiction over Defendants Femcare and UMP would not offend the traditional notions of fair play and substantial justice. *See Sagez*, 2016 WL 11634571, *5-6 (finding an exercise of specific personal jurisdiction would not offend traditional notions of fair play and substantial justice, where the decedent and his representative were residents of Illinois, the accident occurred in Illinois after the product at issue arrived in the State through an established distribution channel, and the accident involving that product resulted in death in Illinois).

For these reasons, when resolving all factual disputes in her favor, the Court finds Plaintiff has made a *prima facie* case of specific personal jurisdiction for Defendants UMP and Femcare. *See McAdams*, 409 F. Supp. 3d at 663; *Karraker*, 239 F. Supp. 2d at 839.[4]

## C. Venue

Defendants UMP and Femcare argue they do not reside in this judicial district. (Docs. 22, pg. 18; 32, pg. 17). They also reiterate the argument that the Court does not have personal jurisdiction. (Docs. 22, pg. 18; 32, pgs. 17-18). Similarly, Defendants UMP and Femcare reargue that there is no evidence that they manufactured or distributed Filshie Clips in Illinois, as necessary for a finding that a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Illinois. (Docs. 22, pg. 18; 32, pg. 18).

In response, Plaintiff argues Defendant UMP and Femcare's venue argument is the same as that related to personal jurisdiction. (Docs. 24, pg. 20 n. 44; 34, pg. 20 n. 37). Under the venue statute discussed below, Plaintiff suggests this District will be a proper

---

[4]By virtue of this conclusion, the Court does not consider Plaintiff's alter ego argument.

venue for the case if the Court finds there is personal jurisdiction over Defendants. (Docs. 24, pg. 20 n. 44; 34, pg. 20 n. 37).

Rule 12(b)(3) allows a defendant to assert, by motion, a defense of improper venue. *See* Fed. R. Civ. P. 12(b)(3). A plaintiff has the burden of establishing a proper venue but, as with personal jurisdiction, factual disputes are resolved in his or her favor. *See Allstate Life Ins. Co. v. Stanley W. Burns, Inc.*, 80 F. Supp. 3d 870, 875 (N.D. Ill. 2015); *Clark v. McDonald's Corp.*, No. 22-cv-628, 2023 WL 2648467, *2 (S.D. Ill. March 27, 2023). Venue refers to the proper place, *i.e.*, the proper district court, to exercise personal jurisdiction. *See Ford-Reyes v. Progressive Funeral Home*, 418 F. Supp. 3d 286, 289 (N.D. Ill. 2019) (citing 17 James Wm. Moore *et al.*, Moore's Federal Practice § 110.015 (3d ed. 2019); Arthur R. Miller, 14D Fed. Prac. & Proc. Juris. § 3801 (4th ed. 2019)). Section 1391(b) states:

> A civil action may be brought in—
>
> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
>
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred…; or
>
> (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b).

As to the first option for venue, a defendant entity with the capacity to sue and be sued, in its common name under the applicable law, whether or not incorporated, is deemed to reside in any judicial district where there is personal jurisdiction. *See id.* § 1391(c)(2). Further, as to the second option, "a substantial part" does not mean "most,"

and venue may be proper in multiple districts. *See Ford-Reyes*, 418 F. Supp. 3d at 290. Indeed, a district court need not be "the best" venue. *See id*. To constitute "a substantial part," however, the Court looks to the overall nature of the claims and the specific events or omissions occurring in the forum. *See Curtis-Campbell*, 2019 WL 13229723, *6. The events or omissions "must be encompassed in the historical predicate of the claim." *See Clark*, 2023 WL 2648467, *3 (citing *Schwarz v. National Van Lines, Inc.*, 317 F. Supp. 2d 829, 834 (N.D. Ill. 2004); *Dickerson v. Perdue*, No. 7-cv-206, 2007 WL 2122418, *6 (S.D. Ill. July 20, 2007)). The analysis focuses on the activities of the defendant, not the plaintiff, and those activities must "share a connection to the elements of the claim." *See id*.

Here, the Court has already found that Plaintiff made a *prima facie* case of specific personal jurisdiction as to Defendants UMP and Femcare. By virtue of that finding, the Court further finds that Plaintiff has shown Defendants UMP and Femcare may be deemed to reside in the Southern District of Illinois under § 1391(b)(1). *See* § 1391(b)(1), (c)(2); *see also Curtis-Campbell v. Premiere Building Materials, Inc.*, No. 19-cv-63, 2019 WL 13229723, *4 (N.D. Ind. July 23, 2019) ("Personal jurisdiction is relevant to the subsection (b)(1) residency analysis…because a corporate defendant…is a resident of 'any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question' for purposes of venue."). Alternatively, the Court finds Plaintiff has shown a substantial part of the events or omissions, giving rise to her claims, occurred in this District under § 1391(b)(2). As was discussed at length with respect to specific personal jurisdiction, Plaintiff has adequately shown Defendants UMP and Femcare delivered Filshie Clips, via exclusive distribution agreements, into the stream of

commerce in the United States with the awareness or expectation that they would be used by Illinois patients. The Court will not repeat those discussions here. However, Plaintiff demonstrated that those activities resulted in the use of Filshie Clips in her 2015 tubal ligation procedure in the Southern District of Illinois. Further, Defendants' post-PMA misconduct allegedly prompted Plaintiff to undergo that tubal ligation procedure in the Southern District of Illinois and prevented the discovery of her injuries, allegedly caused by the detachment and migration of a Filshie Clip from her fallopian tubes, until 2020.

For these reasons, when resolving all factual disputes in Plaintiff's favor, the Court finds she has sufficiently shown venue is proper in the Southern District of Illinois. *See Allstate Life Ins. Co.*, 80 F. Supp. 3d at 875; *Clark*, 2023 WL 2648467, *2.

### III. Conclusion

For the foregoing reasons, Defendants' separate Motions to Dismiss are **DENIED**.

**SO ORDERED.**

Dated: September 25, 2023

s/ *David W. Dugan*
_____
DAVID W. DUGAN
United States District Judge
