## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

SABRINA WILSON,                                    )
                                                   )
      Plaintiff,                           )
                                                   )
vs.                                                )
                                                   )    **Case No. 3:22-cv-1651-DWD**
COOPERSURGICAL, INC., FEMCARE,                     )
LTD., U.K. Subsidiary of Utah Medical             )
Products, Inc., and UTAH MEDICAL                   )
PRODUCTS, INC.,                                    )
                                                   )
      Defendants.                          )

## MEMORANDUM & ORDER

**DUGAN, District Judge:**

Before the Court are Defendants' Motions for Summary Judgment (Docs. 105, 106, 107), to which Plaintiff filed Responses in Opposition (Docs. 130, 131, 132) and Defendants filed Replies in Support (Docs. 136 & 137).[1] Also pending before the Court is Plaintiff's Motion for Summary Judgment on Defendants' Affirmative Defenses (Docs. 111 & 140), to which Defendants filed a Combined Response in Opposition (Docs. 120 & 141) and Plaintiff filed a Reply in Support (Doc. 135). The parties have also filed various Motions to Exclude Opinions (Docs. 108, 109, 110, 112, 113), together with respective Responses in Opposition (Docs. 121, 122, 128, 129, 127), for the Court's consideration.

As explained below, summary judgment is **GRANTED** for Defendants on the basis of preemption. Summary judgment is **DENIED as moot** on all other bases asserted by Defendants. By extension, Plaintiff's Motion for Summary Judgment on Defendants' Affirmative Defenses, as well as the Motions to Exclude Opinions, are **DENIED as moot**.

# I. BACKGROUND

This case involves the female birth control device known as the Filshie Clip, which is a "titanium clip with silicone rubber lining" that is implanted on a woman's fallopian tube. (Doc. 1, pg. 4). It "cause[s] bilateral occlusion (blockage) of the fallopian tubes, eliciting tissue growth and causing a closure of the tubes." (Doc. 1, pg. 4) (cleaned up).

The Filshie Clip is a Class III medical device, so it is "purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health, or…[it] presents a potential unreasonable risk of illness or injury." 21 U.S.C. § 360c(1)(C); (Doc. 1, pg. 5). In 1996, Defendant Femcare, the manufacturer of Filshie Clips, obtained premarket approval ("PMA") for that female birth control device from the Food and Drug Administration ("FDA").[2] (Docs. 1, pgs. 5, 9; 105, pg. 9; 130, pg. 5). It is undisputed that the FDA found Filshie Clips, which reportedly migrated or expulsed .13% of the time, were a safe and effective method of female contraception before granting PMA and an authorization for commercial distribution. (Docs. 1, pgs. 5, 11; 105, pg. 9; 130, pgs. 5, 24-25). The FDA-approved warnings and precautions for Filshie Clips, which are found in the instructions for use of that female birth control device, undisputedly disclosed the following potential adverse effects: pain, clip migration at .13% based on clinical trials, and asymptomatic migration at an unknown frequency. (Docs. 105, pgs. 9, 11; 130, pgs. 5, 8). The relevant instructions for use of Filshie Clips also stated the following warnings and precautions:

7.    PRECAUTIONS

a)    Patient Counselling

- Prior to any sterilization procedure being performed, the patient should be fully informed about alternative methods of contraception, the possible side effects of the procedure, any complications which may arise during and following the procedure and the risks and benefits associated with sterilization in general and the Filshie Tubal Ligation System procedure in particular. The patient should be encouraged to discuss openly and fully any questions she may have concerning the Filshie Clip.

* * *

e)    Side Effects

…

- Clip Migration and Expulsion: Instances of migrated Filshie Clips being expelled from the body per urethra, via vaginal cuff abscess and via bowel abscess have been reported. Rarely, migrated Filshie Clips may cause symptoms without expulsion.

* * *

8.    ADVERSE EFFECTS

The following adverse effects have been reported with the use of the Filshie Tubal Ligation System. The effects are not listed in order of frequency or severity. Reported adverse effects include:- Pregnancy, either uterine or ectopic; abdominal pain and cramping; trauma to pelvic organs; incision infection; urinary tract infections; pelvic cavity infections; expulsion of migrated Clip via abscess; or asymptomatic Clip migration with expulsion.

(Docs. 105, pgs. 10-11; 105-9, pgs. 7-10; 130, pg. 8) (Emphasis in original omitted).

The parties agree these instructions for use "w[ere] approved…by the FDA and adhere[] to the FDA-approved language." (Docs. 105, pg. 11; 130, pg. 8). The FDA also approved updated instructions for use of Filshie Clips in 2021. (Docs. 105, pg. 11; 130, pg. 8). There is agreement among the parties that those instructions for use continued to disclose a Filshie Clip migration rate of .13%. (Docs. 105, pg. 11; 130, pg. 8).

3

Further, the PMA imposed conditions on Defendant Femcare's sale of the product, including labeling requirements and restrictions on advertisements. (Doc. 1, pg. 5). There is agreement among the parties, however, that the PMA for the Filshie Clip has never been suspended or withdrawn by the FDA, and the design of the Filshie Clip has always conformed to the design approved by the FDA. (Docs. 105, pg. 9; 130, pg. 5).

In 2011, Defendant UMP acquired Femcare Group Ltd., of which Defendant Femcare is a subsidiary company. (Doc. 106, pgs. 2-3; 131, pg. 5). Defendant UMP alleges Defendant Femcare is a separate and distinct corporate legal entity. (Doc. 106, pgs. 2-3; 131, pg. 5). In 2015, Plaintiff underwent a tubal ligation procedure, resulting in the implantation of Filshie Clips on her fallopian tubes. (Docs. 1, pgs. 4, 13; 106, pg. 3; 131, pg. 7). Defendant CooperSurgical imported, distributed, marketed, and sold Filshie Clips in the United States at that time. (Doc. 1, pg. 9). In 2019, however, Defendant UMP acquired the exclusive distributorship rights for Filshie Clips in the United States from Defendant CooperSurgical. (Docs. 106, pg. 3; 131, pg. 6). Thereafter, Defendant UMP imported, sold, distributed, and marketed the device in the United States. (Doc. 1, pg. 9).

After her tubal ligation procedure in 2015, Plaintiff began experiencing pain and discomfort in her lower abdominal region. (Doc. 1, pg. 13). The pain, allegedly caused by the detachment and migration of a Filshie Clip from her fallopian tube, which she states can occur over 25% of the time, became more severe. (Doc. 1, pgs. 10, 13).[3] Plaintiff alleges, despite Defendants' knowledge of that risk, she was never informed of the frequency of detachments and migrations or the severity and permanency of the resultant injuries. (Doc. 1, pgs. 10, 13). The doctor who performed the tubal ligation procedure, Dr. Thalia

Pachiyannakis, was aware Filshie Clips could migrate; however, she did not advise patients of that complication, know migrated Filshie Clips to cause pain or other issues, or recall reading the instructions for use or other materials. (Docs. 105, pg. 11; 130, pg. 9).

In August 2020, Plaintiff's doctor allegedly confirmed from radiological imaging that a Filshie Clip was missing. (Doc. 1, pg. 14). The Filshie Clip detached and migrated from her fallopian tube but remained in her body. (Doc. 1, pg. 14). Now, Plaintiff allegedly "live[s] under the specter of having the foreign bodies migrating through her pelvic area and the fear of having to undergo surgery," which she states is often necessary to remove a detached and migrated Filshie Clip from a woman's body. (Doc. 1, pg. 14).

Based on the Court's diversity jurisdiction, Plaintiff filed a 10-count, 93-page Complaint (Doc. 1) against Defendants, jointly and severally, as "companies and/or successors in interest to the companies that designed, developed, manufactured, tested, labeled, packaged, imported, distributed, marketed and/or sold" Filshie Clips. (Doc. 1, pg. 1).[4] Defendants allegedly failed to comply with the PMA's mandates and other provisions of state and federal law. (Doc. 1, pgs. 5-7). More specifically, under 21 C.F.R. §§ 803, 814, and 820 *et seq.*, Plaintiff alleges: (1) strict product liability against Defendant Femcare for design defects (Count 1); (2) strict product liability against Defendant Femcare for a failure to warn (Count 2); (3) product liability against Defendant Femcare for negligence (Count 3); (4) gross negligence against Defendant Femcare (Count 4); (5) punitive damages against Defendant Femcare (Count 5); (6) strict product liability against Defendants CooperSurgical and UMP for design defects (Count 6); (7) strict product liability against Defendants CooperSurgical and UMP for a failure to warn

5

(Count 7); (8) product liability against Defendants CooperSurgical and UMP for negligence (Count 8); (9) gross negligence against Defendants CooperSurgical and UMP (Count 9); and (10) punitive damages against Defendants CooperSurgical and UMP (Count 10).[5][6] With this background in mind, the Court considers the pending Motions.

## II. ANALYSIS

The Court will grant summary judgment if the movant shows there is no genuine dispute as to any material fact, such that it is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a); *accord Driveline Sys., LLC v. Arctic Cat, Inc.*, 936 F.3d 576, 579 (7th Cir. 2019) (quoting *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 853 (7th Cir. 2015); citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Assertions that a fact cannot be or is genuinely disputed must be supported by citations to the materials in the record. Fed. R. Civ. P. 56(c)(1)(A). Alternatively, the assertions must be supported by a showing that the materials cited do not establish the absence or presence of a genuine dispute or that an adverse party cannot produce evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B).

If the movant presents evidence to show the absence of a genuine dispute of material fact, then the burden shifts to the nonmovant to provide evidence of specific facts that create a genuine dispute of material fact. *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) (citing *Hudson Ins. Co. v. City of Chicago Heights*, 48 F.3d 234, 237 (7th Cir. 1995)). A genuine dispute of material fact exists if there is sufficient evidence for the nonmovant to receive a verdict. *Driveline Sys.*, 936 F.3d at 579 (quoting *Aregood v. Givaudan Flavors Corp.*, 904 F.3d 475, 482 (7th Cir. 2018), *reh'g denied* (Oct. 30, 2018)). Speculation that is unsupported by the evidence cannot defeat summary judgment. *Moje v. Fed. Hockey*

*League, LLC*, 377 F. Supp. 3d 907, 920 (N.D. Ill. 2019) (citing *Sbika v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 721 (7th Cir. 2018); *Cleveland v. Porca Co.*, 38 F.3d 289, 295 (7th Cir. 1994)).

When considering a motion for summary judgment, the Court will not determine credibility, weigh the evidence, or decide which inferences to draw from the facts, as those tasks are reserved for the finder of fact. *Runkel v. City of Springfield*, 51 F.4th 736, 741 (7th Cir. 2022) (quoting *Johnson v. Advoc. Health & Hosp. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018)). Instead, based on the evidence, the Court will decide whether a genuine dispute of material fact requires a trial. *Id*. (quoting *Johnson*, 892 F.3d at 893). When doing so, the Court construes the evidence in a light most favorable to the nonmovant while also avoiding the temptation of deciding one party's version of the facts is more likely true than the other party's version of the facts. *Id*. (quoting *Johnson*, 892 F.3d at 893).

### A. Preemption Principles

Through the Supremacy Clause of the United States Constitution, Congress may expressly or impliedly preempt any state law. *McMullen v. Medtronic, Inc.*, 421 F.3d 482, 486-87 (7th Cir. 2005) (quoting U.S. Const. art. VI; *Chambers v. Osteonics Corp.*, 109 F.3d 1243, 1246 (7th Cir. 1997); *Boomer v. AT&T Corp.*, 309 F.3d 404, 417 (7th Cir. 2002); *Hoagland v. Town of Clear Lake, Ind.*, 415 F.3d 693 (7th Cir. 2005)). The Medical Devices Amendments ("MDA") to the Federal Food, Drug, and Cosmetic Act ("FDCA") contain an express preemption provision for Class III medical devices like the Filshie Clip. *See* 21 U.S.C. § 360k(a); *Gravitt v. Mentor Worldwide, LLC*, 646 F. Supp. 3d 962, 965 (N.D. Ill. 2022) ("[F]ederal law limits the state law claims that a plaintiff may pursue for injuries allegedly caused by Class III medical devices."). That express preemption provision provides:

7

(a) General Rule

Except as provided in subsection (b), no State or political subdivision of a

State may establish or continue in effect with respect to a device intended

for human use any requirement—

(1) which is different from, or in addition to, any requirement

applicable under this chapter to the device, and

(2) which relates to the safety or effectiveness of the device or to any

other matter included in a requirement applicable to the device.

21 U.S.C. § 360k(a); *see also McMullen*, 421 F.3d at 487 (noting § 360k(a) preemption

requires (1) a requirement relating to a device intended for human use that a state

establishes or continues in effect, (2) a federal requirement under the FDCA that applies

to the specific device and is relevant to the conduct subject to the state requirement, and

(3) a state requirement that is different from, or in addition to, the federal requirement);

*accord Laverty v. Smith & Nephew, Inc.*, 197 F. Supp. 3d 1026, 1030 (N.D. Ill. 2016).

Federal requirements, specific to individual products, are imposed by the PMA

process that Filshie Clips underwent in 1996, and lawsuits filed against medical device

manufacturers with PMA are expressly preempted if liability is based on state law

violations and § 360k(a)(1) is satisfied. *See McMullen*, 421 F.3d at 487-88 (citing *Mitchell*,

126 F.3d at 911); *Bausch*, 630 F.3d at 550 (discussing *Riegel*, 552 U.S. at 330); *McCutcheon v.

Zimmer Holdings, Inc.*, 586 F. Supp. 2d 917, 921 (N.D. Ill. 2008); *see also Link*, 604 F. Supp.

2d at 1177 ("The PMA process as applied to Class III medical devices by the FDA

constitutes a federal 'requirement' specific to an individual device.").

However, a plaintiff may maintain such a lawsuit, consistent with § 360k(a), if the state and federal requirements are parallel. *Gravitt*, 646 F. Supp. 3d at 965-66 (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 495 (1996)). For a state requirement to be parallel, as opposed to "different from, or in addition to," a federal requirement under § 360k(a)(1), "the plaintiff must show that the requirements are '*genuinely* equivalent.' " *McMullen*, 421 F.3d at 489 (quoting *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 454 (2005) (Emphasis in original)); *accord Laverty*, 197 F. Supp. 3d at 1031. If a manufacturer is liable under state law, but not federal law, then the state and federal requirements are not "genuinely equivalent." *McMullen*, 421 F.3d at 489 (quoting *Bates*, 544 U.S. at 454). That is, if a federal requirement allows conduct that is obligatory under state law, then the state requirement is expressly preempted as "different from, or in addition to," the federal requirement. *Id.*

The Court stresses that § 360k(a) provides immunity to manufacturers of Class III medical devices, such as Filshie Clips, only to the extent they comply with and do not violate federal law. *Bausch*, 630 F.3d at 550, 553; *accord Gravitt v. Mentor Worldwide, LLC*, 289 F. Supp. 3d 877, 885 (N.D. Ill. 2018); *Garross v. Medtronic, Inc.*, 77 F. Supp. 3d 809, 814 (E.D. Wisc. 2015). Nothing in § 360k(a) denies a state the right to provide a traditional damages remedy for violations of common law duties, including as to medical devices granted PMA, when the duties parallel federal requirements. *Bausch*, 630 F.3d at 550, 553 (quoting *Lohr*, 518 U.S. at 495); *accord Gravitt*, 289 F. Supp. 3d at 885; *Laverty*, 197 F. Supp. 3d at 1032; *Garross*, 77 F. Supp. 3d at 814. Such remedies do not impose requirements "different from, or in addition to," federal requirements; they incentivize compliance with federal requirements. *Garross*, 77 F. Supp. 3d at 814 (citing *Lohr*, 518 U.S. at 513).

9

Next, as to implied preemption, § 337(a) of the MDA states: "Except as provided in subsection (b), all such proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the United States." 21 U.S.C. § 337(a). Claims based on well-recognized duties owed in product liability actions under state law, as opposed to claims of "fraud on a federal agency," are assumed to be within the police powers of the States and are not superseded by federal law unless that was the clear and manifest intent of Congress. *Bausch*, 630 F.3d at 557-58; *accord Gravitt*, 646 F. Supp. 3d at 965 ("[S]tate law claims are impliedly preempted to the extent that they are 'fraud-on-the-FDA' claims rather than traditional state law torts."); *Laverty*, 197 F. Supp. 3d at 1034; *Gravitt*, 289 F. Supp. 3d at 888. For example, a plaintiff's claims are impliedly preempted if they seek to use state law to police fraud against a federal agency based on statements that a defendant was required to make to that agency under federal law. *Gravitt*, 289 F. Supp. 3d at 888 (quoting *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 347 (2001)). Again, though, claims based on well-recognized duties owed under state law are not impliedly preempted. *Bausch*, 630 F.3d at 557-58; *Gravitt*, 289 F. Supp. 3d at 888.

In light of these principles, the Seventh Circuit has discussed a gap through which plaintiffs may avoid preemption. *Bausch*, 630 F.3d at 557-58 (quoting *In re Medtronic, Inc., Sprint Fidelis Leads Prods. Liability Litig.*, 623 F.3d 1204 (8th Cir. 2010)). Plaintiff must be suing Defendants for conduct that *violates* the FDCA or her claims will be expressly preempted under § 360k(a); however, Plaintiff cannot be suing Defendants *merely because* the conduct violates the FDCA or her claims will be impliedly preempted. *See id.* (quoting *Medtronic Leads*, 623 F.3d at 1204); *Garross*, 77 F. Supp. 3d at 814. As such, Plaintiff

must be able to demonstrate harm stemming from a violation of the FDCA at the same time as a breach of a well-recognized and parallel duty that is owed under state law. *Bausch*, 630 F.3d at 557-58 (discussing *Medtronic Leads*, 623 F.3d at 1204); *see also Garross*, 77 F. Supp. 3d at 814 ("[A] state law claim which alleges a violation of the FDCA but which alleges that violation in the context of an independent, 'well-recognized duty owed to [plaintiff] under state law' can survive both express and implied preemption.").

### B. The Parties' Preemption Arguments

In this case, Defendants argue Plaintiff's claims are expressly and/or impliedly preempted. [7] [8] When making an argument for express preemption, Defendants suggest only the third condition under § 360k(a) is at issue, namely, whether the Illinois requirements applicable to Filshie Clips are different from, or in addition to, the relevant federal requirements that apply to Filshie Clips under the FDCA. (Doc. 105, pgs. 12-13).

In relation to her claims of a design defect, Defendants argue Plaintiff has not alleged or proven, through fact or expert discovery, that any aspect of the design of Filshie Clips deviated from the design that was approved by the FDA during the PMA process, as necessary for a violation of federal law. (Doc. 105, pgs. 14, 16-17). Defendants stress that Filshie Clips were granted PMA only after "the FDA studied and approved the[m]…as having a reasonable assurance of safety and effectiveness." (Doc. 105, pg. 16). In Defendants' view, Plaintiff's design defect claims are based "entirely on conclusory allegations of…FDA reporting requirements rather than any allegations of a defective design." (Doc. 105, pg. 16) (Emphasis in original omitted). For these reasons, Defendants state Plaintiff's design defect claims must be expressly preempted. (Doc. 105, pgs. 14-17).

11

As to her failure to warn claims, Defendants suggest Plaintiff makes the following core assertions: (1) Defendants failed to include more extensive warnings about the dangers of Filshie Clip migration, including a migration rate up to 25%, in their labeling; and (2) Defendants failed to properly report complaints of Filshie Clip migration to the FDA. (Doc. 105, pgs. 17-19). Defendants argue the first assertion demands a finding of express preemption for the same reasons as Plaintiff's design defect claims, *i.e.*, that "the undisputed facts demonstrate that the Filshie Clip [instructions for use] adhere to the language approved by the FDA." (Doc. 105, pgs. 19-20). Defendants stress Plaintiff does not allege, and her experts do not opine, the Filshie Clip warnings ever deviated from the language approved in the PMA process. (Doc. 105, pg. 20). Defendants also stress, despite Dr. Filshie's 2002 article, which stated "[i]t is estimated that over 25% of patients will experience a migration of one or more Clips," the FDA never required a disclosure of that migration rate in the instructions for use. (Docs. 105, pgs. 9, 20; 130, pgs. 5, 24-25).

Defendants argue Plaintiff's second assertion, related to the failure to properly report complaints of Filshie Clip migration to the FDA, demands a finding of both express and implied preemption. (Docs. 105, pgs. 20-25). That assertion by Plaintiff, which Defendants note is based on violations of federal regulations, allegedly fails to invoke a parallel state law requirement. (Doc. 105, pgs. 20-21). Defendants reason that Illinois law does not recognize a failure to warn claim based on the failure to properly report complaints to the FDA. (Doc. 105, pg. 21). Defendants also emphasize that Plaintiff's claim is based on the failure to warn a regulatory body rather than a customer or physician, the latter of which might be encompassed by Illinois law. (Doc. 105, pg. 21).

12

Since Illinois law differs from the FDA reporting requirements in this way, Defendants maintain Plaintiff's claims are expressly preempted. (Doc. 105, pgs. 21-22).

For similar reasons, Defendants argue Plaintiff's claims, based on a failure to report complaints to the FDA, are impliedly preempted as "improper attempt[s] to enforce federal regulations in the guise of a state-law claim." (Doc. 105, pgs. 22-25). Defendants explain, under Seventh Circuit authority, "claims based on [the] withholding of information to the FDA during the PMA process are impliedly preempted as attempts to privately enforce FDA regulations." (Doc. 105, pgs. 22). Defendants seek an application of that authority, and other similar authorities, in this case. (Doc. 105, pgs. 23-25 n. 8).

Finally, with respect to Plaintiff's claims of negligence and gross negligence, which are purportedly based on the same allegations as the design defect and failure to warn claims, Defendants argue a finding of preemption is equally warranted. (Doc. 105, pgs. 25-26). In other words, to the extent Plaintiff is claiming Defendants were negligent or grossly negligent despite their compliance with the applicable federal requirements for Filshie Clips, Defendants contend those claims are preempted. (Doc. 105, pg. 26).

In her Response, Plaintiff argues Defendants' preemption analysis is "flawed and incomplete." (Doc. 130, pg. 15). As to express preemption, Plaintiff argues she "carefully drafted" her claims to ensure they are limited to breaches of common law duties that parallel federal requirements. (Doc. 130, pg. 18). Further, as to the failure to warn claims based on Defendants' alleged failure to report complaints to the FDA, Plaintiff argues "several courts" have found such claims are not impliedly preempted. (Doc. 130, pgs. 20-23). Most notably, Plaintiff argues *Laverty* recognized Illinois law imposes on

13

manufacturers a duty to engage in reasonable conduct for the end user's benefit, including a duty to comply with federal reporting requirements. (Doc. 130, pgs. 20-21).

Similarly, Plaintiff argues her failure to warn claims, based on Defendants' alleged failure to report a higher migration rate for Filshie Clips to the FDA and, by extension, to include more extensive warnings about Filshie Clip migration in its labeling, is not impliedly preempted. (Doc. 130, pg. 24). In doing so, Plaintiff suggests "Defendants' interpretation of [this] claim is fundamentally wrong," explaining as follows:

> Plaintiff views this issue as closely related to Defendants' failure to report adverse events to the FDA. Plaintiff does not allege that Defendants deviated from the warnings that were approved by the FDA or that the instructions for use accompanying the Filshie Clips failed to 'adhere to the language approved by the FDA.' However, because the Defendants failed to report adverse events, the FDA would not have known about the types of injuries these women experienced, and thus would not know…a more accurate warning is necessary. Similarly, Defendants failed to report scientific articles, studies, and literature that states that the migration rate is higher than what was previously reported to the FDA. As such, Defendants essentially robbed the FDA of the opportunity to ensure that the labeling on the Filshie Clips were up-to-date and accurate.

(Doc. 130, pg. 26) (cleaned up).

For example, despite the conditions for PMA, Defendants admit annual reports were not submitted to the FDA between 1997 and 2006. (Doc. 130, pg. 29). Plaintiff notes the first annual report, " a 'consolidated report' which 'cover[ed] the period 1996 through 2007,' " was submitted to the FDA in 2007. (Doc. 130, pg. 30). Similarly, Defendants allegedly failed to properly disclose Dr. Filshie's 2002 article, which stated "[i]t is estimated that over 25% of patients will experience a migration of one or more Clips," to the FDA in that consolidated report. (Doc. 130, pgs. 24-30). Defendants' report of that

article to the FDA, in a bibliography citing "over twenty other articles," was limited to the following citation: "*Long-term experience with the Filshie Clip*, G.M. Filshie, Department of Obstetrics 7 Gynaecology, University NHS Trust, Questions Medical Centre, Nottingham." (Doc. 130, pg. 28). In Plaintiff's view, Defendants violated federal requirements, governing the timing and manner of reporting information to the FDA, by waiting 5 years after the article was published to report it to the FDA, omitting a summary of the article in the report, failing to discuss how the article's results and conclusions could impact the known safety and effectiveness profile of Filshie Clips, neglecting to describe Defendants' plans for assessing that potential impact, ignoring follow up issues related to safety and effectiveness, and choosing not to specifically mention Dr. Filshie's reference to a 25% migration rate. (Doc. 130, pgs. 28-29). Plaintiff suggests the same is true with respect to "a plethora of other publicly available scientific articles or reports about Filshie Clip migration." (Doc. 130, pgs. 30-31). Under these circumstances, Plaintiff maintains her claims are neither expressly nor impliedly preempted. (Doc. 130, pg. 27).

## C. Application of Preemption Principles

Here, as noted above, it is undisputed the PMA for the Filshie Clip has never been suspended or withdrawn by the FDA, and the design of the Filshie Clip has always conformed to the design approved by the FDA in the PMA process in 1996. *See* 21 U.S.C. § 360e; (Docs. 105, pg. 9; 130, pg. 5). In other words, the FDA determination that Filshie Clips are safe and effective with a reported migration rate of .13%, which was made during the PMA process, remains intact as a matter of federal law. *See* 21 U.S.C. § 360e; *Link*, 604 F. Supp. 2d at 1177; *see also Mikolajczyk v. Ford Motor Co.*, 231 Ill. 2d 516, 543

15

(2008) (noting an element of a claim for strict liability under Illinois law, based on a product defect, is a condition of the product, resulting from its design, that renders the product "unreasonably dangerous"); *Calles v. Scripto-Tokai Corp.*, 224 Ill. 2d 247, 254 (2007) (recognizing a product is "unreasonably dangerous" under Illinois law if it is more dangerous than "an ordinary consumer would expect when used in an intended or reasonably foreseeable manner," or "the magnitude of the danger outweighs the utility of the product, as designed"). In fact, in 2021, the FDA approved updated instructions for use of the Filshie Clip with the same migration rate of .13%. (Docs. 105, pg. 11; 130, pg. 8). And, while Plaintiff claims Defendants violated certain post-PMA reporting requirements, which are discussed further below, the record does not indicate the design of the Filshie Clip has deviated from the design approved by the FDA during the PMA process. *See* 21 U.S.C. § 360e; *see also Riegel*, 552 U.S. at 319 ("Once a device has received premarket approval, the MDA forbids the manufacturer to make, without FDA permission, changes in design specifications, manufacturing processes, labeling, or any other attribute, that would affect safety or effectiveness."); *Blue v. Env't Eng'g, Inc.*, 215 Ill. 2d 78, 95-96 (2005) ("In a negligence defective design case, the focus is on the conduct of the defendant, but in a strict liability defective design case, the focus is on the product.").[9] Accordingly, absent a federal law violation related to the design of the Filshie Clip, the Court concludes Plaintiff's design defect claims under Illinois law (*e.g.*, Counts 1 & 6) are expressly preempted. *See* 21 U.S.C. § 360k(a); *McMullen*, 421 F.3d at 487-89; *Bausch*, 630 F.3d at 550, 553; *Laverty*, 197 F. Supp. 3d at 1030, 1032; *McCutcheon*, 586 F. Supp. 2d at 921; *Link*, 604 F. Supp. 2d at 1177; *Gravitt*, 289 F. Supp. 3d at 885; *Garross*, 77 F. Supp. 3d at 814;

*see also Mack v. CooperSurgical, Inc.*, No. 22-cv-54, 2024 WL 4427846, \*8 (M.D. Al. Oct. 4, 2024) (finding a design defect claim premised on a failure to report to the FDA, both pre and post-PMA, "is the type of fraud-on-the-FDA claim that the Supreme Court [has] determined was preempted," and even though the plaintiffs "d[id] not provide evidence of any failure…to adhere to the FDA-approved design of Filshie Clips," that claim would be expressly preempted as based on a design different from that approved by the FDA).

Similarly, it is undisputed the relevant instructions for use "w[ere] approved…by the FDA and adhere[] to the FDA-approved language." (Docs. 105, pg. 11; 130, pg. 8). Also, as stated above, it is undisputed the instructions for use, as approved by the FDA in 1996 and as updated by that agency in 2021, disclosed a migration rate of .13%. (Docs. 105, pg. 11; 130, pg. 8). Therefore, to the extent Plaintiff's failure to warn claims (*e.g.*, Counts 2 & 7) are based on Defendants' alleged failure to include more extensive warnings about the dangers of Filshie Migration in their labeling, beyond what was required by the instructions for use approved by the FDA, the Court concludes they are expressly preempted. *See* 21 U.S.C. § 360k(a); *McMullen*, 421 F.3d at 487-89; *Bausch*, 630 F.3d at 550, 553; *Laverty*, 197 F. Supp. 3d at 1030, 1032; *McCutcheon*, 586 F. Supp. 2d at 921; *Link*, 604 F. Supp. 2d at 1177; *Gravitt*, 289 F. Supp. 3d at 885; *Garross*, 77 F. Supp. 3d at 814; *see also Salerno v. Innovative Surveillance Tech., Inc.*, 402 Ill. App. 3d 490, 499 (2010) ("Under a failure to warn theory, a plaintiff must demonstrate that the manufacturer did not disclose an unreasonably dangerous condition or instruct on the proper use of the product as to which the average consumer would not be aware. A manufacturer has a duty to warn where the product possesses dangerous propensities and there is unequal

17

knowledge with respect to the risk of harm, and the manufacturer, possessed of such knowledge, knows or should know that harm may occur absent a warning. However, the supreme court long ago held that there is no duty to warn where the product is not defectively designed or manufactured and where the possibility of injury results from a common propensity of the product that is obvious to the user.") (cleaned up); *Mack*, 2024 WL 4427846 at *7 ("This argument [that the defendants should have used more or different language in their FDA-approved warnings and instructions than those previously approved by the FDA for Filshie Clips] demonstrates that the [plaintiffs] are indeed making state law claims based on a fraud-on-the-FDA theory and that Defendants' warnings and labeling should have been different, i.e., reflecting different migration statistics and complications. Such claims clearly are [expressly] preempted.").

However, to the extent any of Plaintiff's claims, particularly her failure to warn claims (*e.g.*, Counts 2 & 7), are based on Defendants' alleged failure to properly report to the FDA, more discussion is required. In short, though, the Court concludes such claims are expressly and impliedly preempted. When resisting that conclusion in her briefing, Plaintiff relies on *Laverty*. In that case, the Northern District of Illinois considered the plaintiffs' negligence and strict product liability claims, which were based on a manufacturing defect and a failure to warn about a Class III medical device. *Laverty*, 197 F. Supp. 3d at 1029. The defendant filed a motion for a judgment on the pleadings that sought, as Defendants seek here, a finding that the plaintiffs' claims were expressly or impliedly preempted. *Id*. When reviewing the issues, the court considered many of the arguments and authorities discussed in this Memorandum & Order. *See id*. at 1030-36.

Ultimately, with respect to the defendant's argument that § 360k(a) expressly preempted the plaintiffs' failure to warn claims, in light of their invocation of "standards of safety or effectiveness that are 'different from, or in addition to,' the standards imposed under the MDA," the Northern District of Illinois reasoned as follows:

> Section 360k does not expressly preempt state law claims alleging harm caused by conduct that violates a federally imposed requirement. That is precisely what the [plaintiffs] have alleged: that [the defendant] failed to disclose information relevant to the safety and effectiveness of its device in violation of the rules the FDA set forth as a condition of premarket approval. Because their failure-to-warn claims do not seek to impose obligations different from or in addition to those imposed through agency action taken pursuant to the MDA, section 360k does not expressly preempt them.

*Id.* at 1030, 1033.

Further, as to implied preemption, the *Laverty* court resolved the defendant's argument that the plaintiffs' "claims [we]re not really tort claims based on a failure to warn but rather [we]re claims that seek to enforce the FDA." *Id.* at 1034. Since the plaintiffs' claims were based on the defendant's "fail[ure] to satisfy its continuing obligation to properly evaluate adverse reports and disclose them to the FDA," rather than a "fail[ure] to warn by making material misrepresentations or omissions in the[] application for premarket approval," the court recognized that the plaintiffs did not "assert[] the sort of fraud-on-the-FDA claims that…were preempted under the FDCA." *Id.* Instead, the plaintiffs were found to be "assert[ing] a traditional tort claim." *Id.*

In *Laverty*, the defendant also argued "Illinois does not impose a 'duty to report to the FDA' on medical device manufacturers," so the plaintiffs' claims were "nothing more

than a thinly veiled attempt to circumvent preemption and privately enforce the FDCA."

*Id*. at 1034. When resolving this argument, the *Laverty* court reasoned as follows:

> [The defendant] defines too narrowly the duty the [plaintiffs] allege it breached.... It is true that Illinois does not impose on medical device manufacturers a "duty to report to the FDA" in so many words. But Illinois does recognize a claim for failure to warn predicated on a product manufacturer's failure to disclose known defects. This duty is not limited to providing warnings directly to end users, but rather "depends on whether the defendant and the plaintiff stood in such a relationship to each other that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff." The MDA sets standards for what, when, how, and to whom a manufacturer must report; it does not eviscerate the longstanding state-imposed duty to warn simply by redefining the way medical device manufacturers satisfy that obligation.

*Id*. at 1034-35 (citing *Woodill v. Parke Davis & Co.*, 79 Ill.2d 26, 29 (1980); *Hernandez v. Schering Corp.*, 2011 IL App (1st) 093306, ¶ 38; quoting *Solis v. BASF Corp.*, 2012 IL App (1st) 110875, ¶ 64).

Since the *Laverty* court believed "reasonable conduct for the benefit of the plaintiff" encompasses a duty to "fully and correctly comply[] with FDA disclosure requirements," it found the plaintiffs' failure to warn claims were not impliedly preempted. *Id*. at 1035.

Obviously, the linchpin in the *Laverty* court's analysis was the opinion that the plaintiffs invoked a well-recognized duty owed under Illinois law—*e.g.*, a duty to disclose known defects—and alleged a harm from a federal law violation. *See id*. at 1034-36. After *Laverty* was decided, however, the Illinois Appellate Court, First District, decided *Norabuena v. Medtronic, Inc.*, 2017 IL App (1st) 162928. In that case, the plaintiffs argued their claims of strict liability and negligence under Illinois law, including for a failure to warn claim based on the failure to submit adverse event reports to the FDA, were

wrongly found to be expressly and impliedly preempted, as they paralleled federal regulations. *Id*. at ¶¶ 16, 27. The defendant argued the plaintiffs' claims were expressly and impliedly preempted because they "would impermissibly impose state-law requirements that are different from and additional to federal requirements." *Id*.

The *Norabuena* court reviewed general preemption principles, the authorities from the Supreme Court of the United States, and the authorities existing at the time from the United States Courts of Appeal. *See id*. at ¶¶ 17-26. As such, it did not review the decision of the Northern District of Illinois in *Laverty*. Relevant to this case, the court reasoned:

> Plaintiffs argue that their claims are not preempted because…they allege [the defendant] failed to report adverse events to the FDA as required as a condition to…premarket approval. However, although plaintiffs have identified a federal requirement that their complaint alleges [the defendant] violated, there is no Illinois requirement that parallels it. Plaintiffs asserted claims for failure to warn. Although Illinois recognizes that a manufacturer may satisfy its duty to warn by conveying information to third-party learned intermediaries, this is not synonymous with an affirmative duty to warn a federal regulatory body. The learned intermediary doctrine states that a manufacturer has a duty "to warn prescribing physicians of a drug's known dangerous propensities" under the understanding that those physicians will use their expert knowledge in adequately warning the patient.  We cannot find that this duty is parallel to the federal requirement. Although the federal appellate courts [have] found differently…those opinions were based upon duties found under Mississippi and Arizona law, respectively, and are therefore distinguishable.

*Id*. at ¶ 28 (citing *Kirk v. Michael Reese Hosp. & Med. Ctr.*, 117 Ill. 2d 507, 519 (1987); quoting *Martin v. Ortho Pharm. Corp.*, 169 Ill. 2d 234, 238 (1996)) (cleaned up).

Accordingly, the *Norabuena* court held the failure to warn claims, based on the failure to submit reports of adverse events to the FDA, were preempted. *Id*. at ¶¶ 28, 41.[10]

Based on this review of *Laverty* and *Norabuena*, it is clear those decisions of the Northern District of Illinois and the Illinois Appellate Court, First District, respectively, are in conflict. Having considered each case, however, the Court finds it must follow *Norabuena*, which, as of this date, is authoritative on the matter of state law at issue. On this point, Defendants are correct to note the following finding of the Seventh Circuit:

> What we have, then, is that the highest state court in Illinois, the Illinois Supreme Court, has not decided the precise issue before us, but an intermediate appellate court has. We are required to apply state law as the highest court of the state interprets it. But in the absence of guiding authority from the state's highest court, we give "great weight to the holdings of the state's intermediate appellate courts and ought to deviate from those holdings only when there are persuasive indications that the highest court of the state would decide the case differently from the decision of the intermediate appellate court."

*Commonwealth Ins. Co. v. Stone Container Corp.*, 323 F.3d 507, 509 (7th Cir. 2003); *accord Kozlowski v. Greenridge Farm, Inc.*, 338 F. Supp. 3d 828, 835 (N.D. Ill. 2018).

In light of *Norabuena*, the Court agrees with Defendants that Plaintiff failed to invoke an Illinois requirement that parallels the federal FDA reporting requirements. *See Norabuena*, 2017 IL App (1st) 162928, ¶ 28; *Gravitt*, 646 F. Supp. 3d at 965-66; *McMullen*, 421 F.3d at 489; *Laverty*, 197 F. Supp. 3d at 1031; *Bausch*, 630 F.3d at 550, 553; *Gravitt*, 289 F. Supp. 3d at 885; *Garross*, 77 F. Supp. 3d at 814. In the words of the *Norabuena* court, "there is *no* Illinois requirement that parallels" the federal requirement to report to the FDA. *See Norabuena*, 2017 IL App (1st) 162928, ¶ 28 (Emphasis added); *see also Glover v. Bausch & Lomb Incorp.*, 6 F.4th 229, 241 n. 8 (2d Cir. 2021) (noting "[i]ntermediate courts of appeal in several other states have addressed whether the law of their state recognizes a duty to report adverse events to the FDA, and Illinois, in *Norabuena*, concluded the

22

plaintiffs' claims were preempted "because 'there is no Illinois requirement' that the manufacturer 'report adverse events to the FDA.' "); *Plourde v. Sorin Grp. USA, Inc.*, 517 F. Supp. 3d 76, 91-92 (D. Ma. 2021) (noting, in *Norabuena*, "the Illinois Court of Appeals issued an opinion interpreting Illinois' failure to warn law…to find that the duty to warn did not compel manufacturers to warn the FDA."); *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1280-81 (10th Cir. 2021) ("[Plaintiffs] claim that Defendant did not properly conduct post-approval, FDA-mandated testing and report negative results. Plaintiffs also theorize that this reporting would have indirectly warned physicians of the implants' dangers. But Plaintiffs have not identified a state-law duty to comply with FDA-imposed post-approval requirements such as testing and reporting. Buckman made clear that only the federal government may enforce reporting requirements and investigate and respond to suspected fraud…. Federal law thus impliedly preempts Plaintiffs' claims based on alleged failures to properly conduct post-approval testing and reporting as attempts to enforce the MDA."). Indeed, if the duty to warn through the conveyance of information to third-party learned intermediaries does not parallel the duty to report to the FDA, which is an issue that was extensively briefed by the parties in the context of causation in this case, then the duty to disclose known product defects through the much broader obligation of engaging in reasonable conduct for the plaintiff's benefit also does not parallel the duty to report to the FDA. *Compare Norabuena*, 2017 IL App (1st) 162928, ¶ 28, with *Laverty*, 197 F. Supp. 3d at 1033-35; *see also Martin by Martin v. Ortho Pharm. Corp.*, 169 Ill.2d 234, 238 (1996) ("This [learned intermediary] doctrine provides that manufacturers…have a duty to warn…physicians of…known dangerous propensities

and that physicians, in turn, using their medical judgment, have a duty to convey any relevant warnings to their patients. The…doctrine, a rule of common law origin, is an exception to the general rule that a failure to warn of a product's dangerous propensities may serve as a basis for holding a manufacturer strictly liable in tort…. Pursuant to the doctrine, there is no duty on the part of the manufacturer…to directly warn patients."); (Docs. 105, pgs. 26-29; 131, pgs. 31-34; 136, pgs. 9-10). It is notable, too, that even the court in *Laverty* seemed to recognize tension between the duty owed under Illinois law and the federal FDA reporting requirement, stating: "It is true that Illinois does not impose on medical device manufacturers a 'duty to report to the FDA' in so many words." *Laverty*, 197 F. Supp. 3d at 1035; *see also Martin by Martin*, 169 Ill.2d at 240 ("[P]laintiffs attempt to use a Federal regulation…to establish the existence of a heretofore unrecognized tort duty, *i.e.*, a pharmaceutical manufacturer's duty to directly warn users.").

Accordingly, the Court concludes Plaintiff's failure to warn claims (Counts 2 & 7) are expressly preempted for seeking to impose obligations different from those imposed by the FDA. *See* 21 U.S.C. § 360k(a); *McMullen*, 421 F.3d at 487-89; *Bausch*, 630 F.3d at 550, 553; *Laverty*, 197 F. Supp. 3d at 1030, 1032; *McCutcheon*, 586 F. Supp. 2d at 921; *Link*, 604 F. Supp. 2d at 1177; *Gravitt*, 289 F. Supp. 3d at 885; *Garross*, 77 F. Supp. 3d at 814; *see also Mack*, 2024 WL 4427846 at *7 ("As it concerns any duty to report, while the [plaintiffs] argue there is a duty of 'reasonable diligence,' they point to no Alabama law that parallels the federal requirement to report adverse events to the FDA nor to any federal law that requires reporting of adverse events to the [plaintiffs] or the medical community. Therefore, such an assertion here under the [plaintiff]s' state law theories

would impose requirements on the Defendants that are different from or in addition to the requirements imposed by the FDA [for Filshie Clips].”). Likewise, in the absence of a parallel Illinois requirement, the Court concludes Plaintiff is merely seeking to enforce federal regulations, such that her claims are also impliedly preempted. *See* 21 U.S.C. § 337(a); *Bausch*, 630 F.3d at 557-58; *Gravitt*, 646 F. Supp. 3d at 965; *Laverty*, 197 F. Supp. 3d at 1034; *Gravitt*, 289 F. Supp. 3d at 888; *Garross*, 77 F. Supp. 3d at 814; *see also In re Medtronic, Inc.*, 623 F.3d at 1205-06 (“Plaintiffs alleged that Medtronic failed to provide the FDA with sufficient information and did not timely file adverse event reports, as required by federal regulations…. [T]hese claims are simply an attempt by private parties to enforce the MDA, claims foreclosed by § 337(a) as construed in *Buckman*.”); *Mack*, 2024 WL 4427846 at *8 (“[B]ecause the Macks have not provided sufficient evidence supporting a failure to warn claim beyond the Defendants’ alleged failure to report adverse [Filshie Clip] events to the FDA, those claims are impliedly preempted.”).

Plaintiff’s claims of negligence and gross negligence must suffer the same fate as her claims of strict liability. Those claims are largely based on the same allegations and theories of liability. And, as to the strict liability claims, the Court has already found the PMA for the Filshie Clip has never been suspended or withdrawn by the FDA, the design of the Filshie Clip has always conformed to the design approved by the FDA in the PMA process, the FDA determination that the Filshie Clip is safe and effective with a reported .13% migration rate remains intact as a matter of federal law, the FDA approved updated instructions for use of the Filshie Clip with the same migration rate of .13%, the record does not indicate the design of the Filshie Clip has deviated from the design approved by

the FDA, the Filshie Clip instructions for use "w[ere] approved…by the FDA and adhere[] to the FDA-approved language," and Plaintiff did not raise a state requirement that parallels the federal FDA reporting requirements because "there is no [such] Illinois requirement." *See* 21 U.S.C. § 360e; *Norabuena*, 2017 IL App (1st) 162928, ¶ 28; (Docs. 105, pgs. 9, 11; 130, pgs. 5, 8). These findings, which resulted in conclusions that Plaintiff's strict liability claims are expressly or impliedly preempted, also foreclose her claims of negligence and gross negligence. *See Blue*, 215 Ill. 2d at 96 ("Illinois cases considering a cause of action for defective products liability sounding in negligence rather than strict liability are rare, probably because it appears to plaintiffs that it is easier to prove the strict liability count."); *Calles*, 224 Ill. 2d at 270-71 ("A product liability action asserting a claim based on negligence…falls within the framework of common law negligence. Thus, a plaintiff must establish the existence of a duty of care owed by the defendant, a breach of that duty, an injury that was proximately caused by that breach, and damages. The key distinction between a negligence claim and a strict liability claim lies in the concept of fault…. [I]n a negligence claim, a defendant's fault is at issue in addition to the condition of the product. A manufacturer has a nondelegable duty to design reasonably safe products. The crucial question…is whether the manufacturer exercised reasonable care in the design of the product. In determining whether the manufacturer's conduct was reasonable, the question is whether in the exercise of ordinary care the manufacturer should have foreseen that the design would be hazardous to someone. To show that the manufacturer acted unreasonably based on the foreseeability of harm, the plaintiff must show the manufacturer knew or should have known of the risk posed by the product

26

design at the time of manufacture.") (cleaned up); *Bausch*, 630 F.3d at 553 ("Illinois treats a violation of a statute or ordinance designed to protect human life or property as prima facie evidence of negligence."); *Mack*, 2024 WL 4427846 at *6 ("The preemption analysis for each [strict liability and negligence] theory of liability applies equally to each claim [regarding Filshie Clips], so the Court will address these claims based on each theory together."). As a result, the Court concludes Plaintiff's negligence and gross negligence claims (Counts 3, 4, 8, 9) are expressly or impliedly preempted for the same reasons as her strict liability claims (Counts 1, 2, 6, 7). *See* 21 U.S.C. §§ 360k(a), 337(a); *McMullen*, 421 F.3d at 487-89; *Bausch*, 630 F.3d at 550, 553, 557-58; *Gravitt*, 646 F. Supp. 3d at 965; *Laverty*, 197 F. Supp. 3d at 1030, 1032, 1034; *McCutcheon*, 586 F. Supp. 2d at 921; *Link*, 604 F. Supp. 2d at 1177; *Gravitt*, 289 F. Supp. 3d at 885, 888; *Garross*, 77 F. Supp. 3d at 814.

In sum, Defendants are entitled to summary judgment on Plaintiff's substantive claims because they are preempted by federal law.[11] In light of that conclusion, Defendants are also entitled to summary judgment on Plaintiff's claims for punitive damages (Counts 5 & 10). The Court finds it is unnecessary to address the parties' other arguments. More specifically, since Plaintiff's claims are preempted by federal law, it is unnecessary for the Court to consider whether the record contains sufficient evidence of causation, whether the record contains sufficient evidence of punitive damages, whether Plaintiff adequately disclosed and substantiated her economic damages, whether Defendant UMP can be liable as the parent company of Defendant Femcare, whether Plaintiff would be entitled to summary judgment on Defendants' affirmative defenses, and whether it would be necessary to exclude the expert opinions on these issues.

### III. CONCLUSION

As explained above, summary judgment is **GRANTED** for Defendants on the basis of preemption. Summary judgment is **DENIED as moot** on all other bases asserted by Defendants. By extension, Plaintiff's Motion for Summary Judgment on Defendants' Affirmative Defenses, as well as the Motions to Exclude Opinions, are **DENIED as moot**. The Clerk of the Court is **DIRECTED** to enter judgment accordingly and to close the case.

**SO ORDERED.**

Dated: September 9, 2025

s/ *David W. Dugan*
_____
DAVID W. DUGAN
United States District Judge

---

[1]While Defendant CooperSurgical's filing is captioned as a Motion and Memorandum in Support of a Joinder in Defendants Femcare and UMP's Motions for Summary Judgment, it will be referred to as a Motion for Summary Judgment in this Memorandum & Order. (Doc. 107).

[2]The PMA process operates as a federal safety review that is specific to individual devices. *Link v. Zimmer Holdings, Inc.*, 604 F. Supp. 2d 1174, 1177 (N.D. Ill. 2008). The FDA grants PMA "only to individual devices that it determines provide a reasonable assurance of safety and effectiveness." *Id.* (citing *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 323 (2008)). The FDA weighs considerations related to the device, reaches a conclusion, then implements the conclusion through a specific mandate on manufacturers and producers. *Id.* at 1177, 1179 (quoting *Mitchell v. Collagen Corp.*, 126 F.3d 902, 911 (7th Cir. 1997)). The PMA process for Class III medical devices, including requirements for applications for PMA, FDA action on applications, and the withdrawal and temporary suspension of PMAs, is set forth in 21 U.S.C. § 360e. That PMA process is "rigorous," as "devices receiving the most federal oversight are those in Class III." *Riegel*, 552 U.S. at 317.

[3]On summary judgment, the parties agree, in 2002, the inventor of the Filshie Clip, Dr. Marcus Filshie, published an article that stated: "It is estimated that over 25% of patients will experience a migration of one or more Clips." (Docs. 105, pg. 9; 130, pgs. 5, 24-25). However, they disagree on the supportability and persuasiveness of both that statement and the Declaration submitted by Dr. Filshie in this case. (Docs. 105, pg. 9; 105-6; 130, pgs. 5-6, 25 n. 14). Defendant Femcare notes that even Dr. Filshie describes the "over 25%" migration figure as "anecdotal" and, "at best, a guesstimate." (Docs. 105, pg. 9; 105-6, pgs. 5-6). Defendant Femcare further notes Dr. Filshie's view that there is no scientific evidence or data behind the "over 25%" migration figure, meaning that figure should not be used or relied upon as a statistic to inform the decisions of physicians or women regarding whether to use Filshie Clips. (Docs. 105, pg. 9; 105-6, pg. 6). Plaintiff, for her part, describes Dr. Filshie's Declaration as "self-serving, hearsay, produced after [the] close of discovery, written by an attorney, and irrelevant." (Doc. 130, pgs. 5, 25 n. 14). Plaintiff also notes Dr. Filshie, over 20 years later, cannot recall exactly how he arrived at the "over 25%" migration figure.

(Docs. 105, pgs. 5-6; 130, pgs. 6, 25 n. 14). However, Plaintiff suggests he "has made no effort to correct his published medical literature to note that the 25% figure he published was merely a 'guesstimate.' " (Doc. 130, pgs. 6, 25 n. 14). Dr. Filshie's article, which was published in 2002, was reported to the FDA in 2007. (Docs. 105, pgs. 9-10; 130, pg. 6). While Plaintiff disputes Defendants' compliance with the procedures for reporting to the FDA, the parties agree the FDA did not request changes to the warnings or precautions stated in the instructions for use of Filshie Clips due to that article. (Docs. 105, pgs. 9-10; 130, pgs. 6-7).

[4]Plaintiff is a citizen of Illinois. (Doc. 1, pg. 2). Defendant CooperSurgical, Inc., is a citizen of both Delaware, where it is incorporated, and Connecticut, where it maintains its principal place of business. (Doc. 1, pg. 2). Defendant Femcare is a citizen of Romsey, Hampshire, England, where it maintains its principal place of business. (Doc. 1, pg. 2). Defendant UMP is a citizen of Utah, where it maintains its principal place of business. (Doc. 1, pg. 2). Plaintiff requests an amount over $75,000 in damages.

[5]When denying Defendants' Motions to Dismiss, the Court reasoned, "in cases alleging the defective manufacture of a medical device, 'courts must keep in mind that much of the product-specific information about manufacturing needed to investigate such a claim fully is kept confidential by federal law,' such that formal discovery is necessary before a plaintiff can fairly be expected to make detailed statements on the specific bases of her claims." (Doc. 75, pgs. 15-16) (citing *Bausch v. Stryker Corp.*, 630 F.3d 546, 558 (7th Cir. 2010)). For that reason, it was "notable, at least at the time of the Complaint, 'Plaintiff d[id] not have access to the complete Filshie Clip PMA approval order, Femcare's PMA application, specific post approval requirements, or any supplementary orders[] along with specified requirements listed therein.' " (Doc. 75, pg. 15) (citing Doc. 1, pg. 17 n. 3). Plaintiff suggested, "once she 'obtain[ed] [the] PMA approval order and related documents through discovery, [she] w[ould] amend th[e] Complaint based on the specific requirements set forth therein as necessary.' " (Doc. 75, pg. 15) (citing Doc. 1, pg. 17 n. 3). Despite this statement, however, Plaintiff never sought leave to file an Amended Complaint.

[6]Plaintiff invokes the following regulations for each Count of the Complaint:

§ 814.80 General.

A device may not be manufactured, packaged, stored, labeled, distributed, or advertised in a manner that is inconsistent with any conditions to approval specified in the PMA approval order for the device.

§ 814.82 Postapproval requirements.

(a) FDA may impose postapproval requirements in a PMA approval order or by regulation at the time of approval of the PMA or by regulation subsequent to approval. Postapproval requirements may include as a condition to approval of the device:

…

(2) Continuing evaluation and periodic reporting on the safety, effectiveness, and reliability of the device for its intended use. FDA will state in the PMA approval order the reason or purpose for such requirement and the number of patients to be evaluated and the reports required to be submitted.

(3) Prominent display in the labeling of a device and in the advertising of any restricted device of warnings, hazards, or precautions important for the device's safe and

effective use, including patient information, e.g., information provided to the patient on alternative modes of therapy and on risks and benefits associated with the use of the device.

…

(5) Maintenance of records that will enable the applicant to submit to FDA information needed to trace patients if such information is necessary to protect the public health….

(6) Maintenance of records for specified periods of time and organization and indexing of records into identifiable files to enable FDA to determine whether there is reasonable assurance of the continued safety and effectiveness of the device.

…

(9) Such other requirements as FDA determines are necessary to provide reasonable assurance, or continued reasonable assurance, of the safety and effectiveness of the device.

§ 814.84 Reports.

(a) The holder of an approved PMA shall comply with the requirements of part 803 and with any other requirements applicable to the device by other regulations in this subchapter or by order approving the device.

(b) Unless FDA specifies otherwise, any periodic report shall:

(1) Identify changes described in § 814.39(a) and changes required to be reported to FDA under § 814.39(b).

(2) Contain a summary and bibliography of the following information not previously submitted as part of the PMA:

(i) Unpublished reports of data from any clinical investigations or nonclinical laboratory studies involving the device or related devices and known to or that reasonably should be known to the applicant.

(ii) Reports in the scientific literature concerning the device and known to or that reasonably should be known to the applicant. If, after reviewing the summary and bibliography, FDA concludes that the agency needs a copy of the unpublished or published reports, FDA will notify the applicant that copies of such reports shall be submitted.

(3) Identify changes made pursuant to an exception or alternative granted under § 801.128 or § 809.11 of this chapter.

(4) Identify each device identifier currently in use for the device, and each device identifier for the device that has been discontinued since the previous periodic report. It is not necessary to identify any device identifier discontinued prior to December 23, 2013.

§ 820.100 Corrective and preventive action.

(a) Each manufacturer shall establish and maintain procedures for implementing corrective and preventive action. The procedures shall include requirements for:

(1) Analyzing processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned product, and other sources of quality data to identify existing and potential causes of nonconforming product, or other quality problems. Appropriate statistical methodology shall be employed where necessary to detect recurring quality problems;

(2) Investigating the cause of nonconformities relating to product, processes, and the quality system;

(3) Identifying the action(s) needed to correct and prevent recurrence of nonconforming product and other quality problems;

(4) Verifying or validating the corrective and preventive action to ensure that such action is effective and does not adversely affect the finished device;

(5) Implementing and recording changes in methods and procedures needed to correct and prevent identified quality problems;

(6) Ensuring that information related to quality problems or nonconforming product is disseminated to those directly responsible for assuring the quality of such product or the prevention of such problems; and

(7) Submitting relevant information on identified quality problems, as well as corrective and preventive actions, for management review.

(b) All activities required under this section, and their results, shall be documented.

§ 820.198 Complaint files.

(a) Each manufacturer shall maintain complaint files. Each manufacturer shall establish and maintain procedures for receiving, reviewing, and evaluating complaints by a formally designated unit. Such procedures shall ensure that:

(1) All complaints are processed in a uniform and timely manner;

(2) Oral complaints are documented upon receipt; and

(3) Complaints are evaluated to determine whether the complaint represents an event which is required to be reported to FDA under part 803 of this chapter, Medical Device Reporting.

(b) Each manufacturer shall review and evaluate all complaints to determine whether an investigation is necessary. When no investigation is made, the manufacturer shall maintain a record that includes the reason no investigation was made and the name of the individual responsible for the decision not to investigate.

(c) Any complaint involving the possible failure of a device, labeling, or packaging to meet any of its specifications shall be reviewed, evaluated, and investigated, unless such investigation has already been performed for a similar complaint and another investigation is not necessary.

(d) Any complaint that represents an event which must be reported to FDA under part 803 of this chapter shall be promptly reviewed, evaluated, and investigated by a designated individual(s) and shall be maintained in a separate portion of the complaint files or otherwise clearly identified. In addition to the information required by § 820.198(e), records of investigation under this paragraph shall include a determination of:

(1) Whether the device failed to meet specifications;

(2) Whether the device was being used for treatment or diagnosis; and

(3) The relationship, if any, of the device to the reported incident or adverse event.

(e) When an investigation is made under this section, a record of the investigation shall be maintained by the formally designated unit identified in paragraph (a) of this section. The record of investigation shall include:

(1) The name of the device;

(2) The date the complaint was received;

(3) Any unique device identifier (UDI) or universal product code (UPC), and any other device identification(s) and control number(s) used;

(4) The name, address, and phone number of the complainant;

(5) The nature and details of the complaint;

(6) The dates and results of the investigation;

(7) Any corrective action taken; and

(8) Any reply to the complainant.

(f) When the manufacturer's formally designated complaint unit is located at a site separate from the manufacturing establishment, the investigated complaint(s) and the record(s) of investigation shall be reasonably accessible to the manufacturing establishment.

32

(g) If a manufacturer's formally designated complaint unit is located outside of the United States, records required by this section shall be reasonably accessible in the United States at either:

 (1) A location in the United States where the manufacturer's records are regularly kept; or

 (2) The location of the initial distributor.

### § 803.1 What does this part cover?

(a) This part establishes the requirements for medical device reporting for device user facilities, manufacturers, importers, and distributors. If you are a device user facility, you must report deaths and serious injuries that a device has or may have caused or contributed to, establish and maintain adverse event files, and submit summary annual reports. If you are a manufacturer or importer, you must report deaths and serious injuries that your device has or may have caused or contributed to, you must report certain device malfunctions, and you must establish and maintain adverse event files. If you are a manufacturer, you must also submit specified followup. These reports help us to protect the public health by helping to ensure that devices are not adulterated or misbranded and are safe and effective for their intended use. If you are a medical device distributor, you must maintain records (files) of incidents, but you are not required to report these incidents.

(b) This part supplements and does not supersede other provisions of this chapter, including the provisions of part 820 of this chapter.

…

### § 803.10 Generally, what are the reporting requirements that apply to me?

(a) If you are a device user facility, you must submit reports (described in subpart C of this part), as follows:

 (1) Submit reports of individual adverse events no later than 10 work days after the day that you become aware of a reportable event:

  (i) Submit reports of device-related deaths to us and to the manufacturer, if known, or

  (ii) Submit reports of device-related serious injuries to the manufacturers or, if the manufacturer is unknown, submit reports to us.

 (2) Submit annual reports (described in § 803.33) to us.

(b) If you are an importer, you must submit reports (described in subpart D of this part), as follows:

(1) Submit reports of individual adverse events no later than 30 calendar days after the day that you become aware of a reportable event:

(i) Submit reports of device-related deaths or serious injuries to us and to the manufacturer or

(ii) Submit reports of device-related malfunctions to the manufacturer.

(2) [Reserved]

(c) If you are a manufacturer, you must submit reports (described in subpart E of this part) to us, as follows:

(1) Submit reports of individual adverse events no later than 30 calendar days after the day that you become aware of a reportable death, serious injury, or malfunction.

(2) Submit reports of individual adverse events no later than 5 work days after the day that you become aware of:

(i) A reportable event that requires remedial action to prevent an unreasonable risk of substantial harm to the public health or

(ii) A reportable event for which we made a written request.

(3) Submit supplemental reports if you obtain information that you did not submit in an initial report.

§ 803.40 If I am an importer, what reporting requirements apply to me?

(a) Reports of deaths or serious injuries. You must submit a report to us, and a copy of this report to the manufacturer, as soon as practicable, but no later than 30 calendar days after the day that you receive or otherwise become aware of information from any source, including user facilities, individuals, or medical or scientific literature, whether published or unpublished, that reasonably suggests that one of your marketed devices may have caused or contributed to a death or serious injury. You must submit the information required by § 803.42. Reports sent to the Agency must be submitted in accordance with the requirements of § 803.12(a).

(b) Reports of malfunctions. You must submit a report to the manufacturer as soon as practicable but no later than 30 calendar days after the day that you receive or otherwise become aware of information from any source, including user facilities, individuals, or through your own research, testing, evaluation, servicing, or maintenance of one of your devices, that reasonably suggests that one of your devices has malfunctioned and that this device or a similar device that you market would be likely to cause or contribute to a death or serious injury if the malfunction were to recur. You must submit the information required by § 803.42. Reports to manufacturers may be made in accordance with § 803.11(b).

§ 803.50 If I am a manufacturer, what reporting requirements apply to me?

(a) If you are a manufacturer, you must report to us the information required by § 803.52 in accordance with the requirements of § 803.12(a), no later than 30 calendar days after the day that you receive or otherwise become aware of information, from any source, that reasonably suggests that a device that you market:

(1) May have caused or contributed to a death or serious injury or

(2) Has malfunctioned and this device or a similar device that you market would be likely to cause or contribute to a death or serious injury, if the malfunction were to recur.

(b) What information does FDA consider "reasonably known" to me?

(1) You must submit all information required in this subpart E that is reasonably known to you. We consider the following information to be reasonably known to you:

(i) Any information that you can obtain by contacting a user facility, importer, or other initial reporter;

(ii) Any information in your possession; or

(iii) Any information that you can obtain by analysis, testing, or other evaluation of the device.

(2) You are responsible for obtaining and submitting to us information that is incomplete or missing from reports submitted by user facilities, importers, and other initial reporters.

(3) You are also responsible for conducting an investigation of each event and evaluating the cause of the event. If you cannot submit complete information on a report, you must provide a statement explaining why this information was incomplete and the steps you took to obtain the information. If you later obtain any required information that was not available at the time you filed your initial report, you must submit this information in a supplemental report under § 803.56 in accordance with the requirements of § 803.12(a).

§ 803.58 Foreign manufacturers.

(a) Every foreign manufacturer whose devices are distributed in the United States shall designate a U.S. agent to be responsible for reporting in accordance with § 807.40 of this chapter. The U.S. designated agent accepts responsibility for the duties that such designation entails. Upon the effective date of this regulation, foreign manufacturers shall inform FDA, by letter, of the name and address of the U.S. agent designated under this section and § 807.40 of this chapter, and shall update this information as necessary. Such updated information shall be submitted to FDA, within 5 days of a change in the designated agent information.

(b) U.S.-designated agents of foreign manufacturers are required to:

(1) Report to FDA in accordance with §§ 803.50, 803.52, 803.53, and 803.56;

35

(2) Conduct, or obtain from the foreign manufacturer the necessary information regarding, the investigation and evaluation of the event to comport with the requirements of § 803.50;

(3) Forward MDR complaints to the foreign manufacturer and maintain documentation of this requirement;

(4) Maintain complaint files in accordance with § 803.18; and

(5) Register, list, and submit premarket notifications in accordance with part 807 of this chapter.

21 C.F.R. §§ 814.80, 814.82(a)(2), (3), (5), (6), (9), 814.84, 820.100, 820.198, 803.1, 803.10, 803.40, 803.50, 803.58 (Emphasis in original omitted).

[7]Defendants' Motions for Summary Judgment present overlapping issues and arguments. In fact, Defendants join portions of each other's Motions for Summary Judgment. (Docs. 105, pgs. 6-7, 34; 106, pgs. 1-2, 15-17; 107, generally). Therefore, the Court addresses the parties' arguments in a single analysis.

[8]While it fully joins Defendant Femcare's arguments, Defendant UMP, for its own part, also states:

[S]ummary judgement on preemption is warranted because Plaintiff's FDA regulatory expert, Dr. Sharlin, offers no opinions that support a claim against Utah Medical. In that regard, Dr. Sharlin's only opinion regarding Utah Medical is that a 2017 brochure allegedly violated FDA regulations. As previously stated, however, that brochure post-dates Plaintiff's tubal ligation surgery and was never circulated in the United States. Thus, not only is there no FDA violation relating to this brochure (as it was not distributed within the FDA's jurisdiction), there is also no causal connection between the brochure and Plaintiff's injuries (as it came out in the United Kingdom only two years after Plaintiff's surgery). As there are no other allegations that Utah Medical, individually, violated FDA regulations, the only valid claims remaining against it are those asserted against all Defendants. Those claims are preempted for the reasons set forth in Femcare's Motion for Summary Judgement.

(Doc. 106, pg. 16) (cleaned up).

[9]In response to Defendant Femcare's preemption arguments, Plaintiff does not specifically address her design defect claims. Instead, she focuses on her failure to warn claims. *See, e.g.*, (Doc. 130, pg. 17) ("In Particular, Plaintiff's Failure to Warn Claims are not Preempted"). Defendant Femcare takes note of this circumstance in its Reply, stating: "Plaintiff does not oppose summary judgment as to her design defect claim. She does not even address Femcare's arguments on that claim." (Doc. 136, pg. 3). Nevertheless, out of an abundance of caution, and in order to facilitate a complete review of the preemption issue on summary judgment, the Court has addressed Plaintiff's design defect claims in the above analysis.

[10]Notably, the court in *Norabuena* found the plaintiffs' failure to warn claims, based on a prohibition on misbranding rather than the defendant's failure to submit reports of adverse events to the FDA, were not expressly or impliedly preempted. *See Norabuena*, 2017 IL App (1st) 162928, ¶¶ 16, 27, 29-33.

36

---

[11]Since the completion of the summary judgment briefing, Defendants have submitted supplemental authorities to support a finding of preemption in this case. *See, e.g.*, *Arnold v. CooperSurgical, Inc.*, No. 22-cv-1951, 2025 WL 622075 (S.D. Ohio Feb. 26, 2025) (granting summary judgment for Defendants CooperSurgical and UMP based on preemption in a case involving allegations, grounded in strict liability, of a failure to warn about Filshie Clips); *Bulox v. CooperSurgical, Inc.*, No. 21-cv-2320, Docs. 190 & 192 (S.D. Tex. March 6 and 25, 2025) (granting summary judgment for Defendants Femcare, CooperSurgical, and UMP based on preemption in a case involving allegations, grounded in strict liability and negligence, of a design defect and failure to warn about Filshie Clips); *see also* (Docs. 142, 143, 144, 145, 150).